UNITED STATES of America, Plaintiff,

v.

Noe COLIMA–MONGE, Defendant.

CR No. 96–305–FR.

United States District Court,
D. Oregon.

April 14, 1997.

Kristine Olson, U.S. Attorney, Kathleen L. Bickers, Special Assistant U.S. Attorney, Portland, OR, for Plaintiff.

Steven T. Wax, Federal Public Defender, Nancy Bergeson, Arron Guevara, Assistant Federal Public Defenders, Portland, OR, for Defendant.

## OPINION

FRYE, District Judge:

Before the court is the motion of the defendant, Noe Colima–Monge, to suppress evidence (# 12) (1 & 2).

## FINDINGS OF FACT

Cesar Castillo, an undercover confidential reliable informant for the Police Department of the City of Keizer, Oregon, had been purchasing drugs from a man known as Grande. Grande told Castillo that he could connect him with a man Castillo later learned was Victor Delgado, and that Delgado was dealing a lot of heroin and cocaine. On July 2, 1996, Castillo called Delgado to discuss the purchase of ten ounces of heroin from Delgado. Castillo reported this conversation to Detective Sergeant William Gray of the Portland Police Bureau. Detective Sergeant Gray works with the Regional Organized Crime and Narcotics Agency (ROCN).

On the morning of July 3, 1996, Castillo and Delgado had a telephone conversation. Delgado did not know that Detective Sergeant Gray was listening silently on a three-way line. Delgado told Castillo to meet him at the El Tapatio Restaurant in Portland, Oregon, and that he had "it," which Detective Sergeant Gray took to mean the heroin, with him. Tr. 592. Delgado also confirmed that Castillo had the money.

After this telephone conversation ended, Detective Sergeant Gray told Castillo to call Delgado back and to tell him that he [Castillo] was being "tailed" so that they had to change the place to meet. Within one-half hour after the first three-way telephone call, Castillo made a second three-way call to Delgado, again with Detective Sergeant Gray listening silently on the line. Delgado told Castillo that he was at the El Tapatio Restaurant. Castillo told Delgado that he wanted to change the location of their meeting because he was being "tailed." Delgado paused and asked someone with him if it was all right to go to another location. The other person, a native Spanish-speaking male, said in Spanish that it was all right to change the location of their meeting. Delgado suggested that they meet at a rest stop on Interstate 5 south of Portland, Oregon.

While these telephone calls were taking place, several police officers went to the El Tapatio Restaurant to assist in the investigation and to make an arrest, if necessary. Sergeant Robert Lowe of the Clackamas County Sheriffs Department arrived at the El Tapatio Restaurant at 11:00 a.m. on July 3, 1996. Shortly thereafter, Delgado and the defendant, Noe Colima–Monge, pulled into the parking lot in a white 1989 Ford Probe automobile. Colima–Monge and Delgado are cousins. The men entered the El Tapatio Restaurant. A few minutes later, Delgado left the restaurant, went to the 1989 Ford Probe, opened the passenger door, and did something behind the right rear passenger seat. He returned to the restaurant after a few minutes.

Detective Herbert Royster of the Oregon State Police Bureau entered the El Tapatio Restaurant a few minutes after Colima–Monge and Delgado had entered the restaurant. He sat down in a booth adjacent to the booth in which Colima–Monge and Delgado were sitting. A cellular telephone located in the booth with Colima–Monge and Delgado rang and was answered in Spanish by one of the men. Detective Royster does not know whether Colima–Monge or Delgado answered the telephone; however, both men spoke during the telephone conversation. One man spoke substantially longer than the other man. Detective Royster does not speak Spanish fluently, but he understood the following words which were spoken in Spanish during the conversation between Colima–Monge and Delgado: drugs, narcotics officers, "coke," cocaine, dog (a derogatory word for police officers), and immigration. After the telephone conversation, Detective Royster stated that the tone of the conversation between Colima–Monge, Delgado, and at times a waitress, changed from lighthearted banter to something much more serious. Also after the telephone conversation, the waitress began moving to and from various windows in the restaurant, carefully scanning the area surrounding the restaurant, and then returning to talk to Colima–Monge and Delgado. Detective Royster decided that he was in danger and left the restaurant. Colima–Monge and Delgado remained in the restaurant.

Officer Keith Weis of the federal Drug Enforcement Administration (the DEA) began surveillance of the El Tapatio Restaurant at 11:30 a.m. He saw the two suspects, Colima–Monge and Delgado, leave the El

Tapatio Restaurant at 12:15 p.m. and walk toward the 1989 Ford Probe. Both men scanned the parking lot and the adjacent street, S.E. 82nd Avenue, in a manner which Weis associated with drug dealers looking for customers or looking out for law enforcement officers. The 1989 Ford Probe has two doors and a hatchback. Colima–Monge walked to the passenger side of the 1989 Ford Probe, opened the door, moved the front passenger seat forward, and leaned into the back of the vehicle for about two minutes. The men then got into the vehicle, and with Delgado driving, left the parking lot.

When Colima–Monge and Delgado left the parking lot in the 1989 Ford Probe, Detective Sergeant Dirk Anderson of the Portland Police Bureau advised Officer Anthony Marshall, an officer in uniform with the Portland Police Bureau who was driving a marked police car, to look for a traffic infraction that would allow him to stop the driver of the 1989 Ford Probe in a nonthreatening manner. Detective Sergeant Anderson observed the driver of the 1989 Ford Probe "cut off" another car when he entered the left turn lane from S.E. 82nd Avenue to S.E. Powell Boulevard. Detective Sergeant Anderson relayed this information to Officer Marshall, who signaled the driver of the 1989 Ford Probe to pull over.

Delgado gave Officer Marshall a driver's license and the automobile registration for the 1989 Ford Probe. Officer Marshall realized that Colima–Monge and Delgado did not speak English well and informed Detective Sergeant Anderson and Detective Sergeant Gray of this when they arrived at the scene of the stop shortly thereafter.

Detective Sergeant Gray speaks Spanish. He spoke to Delgado. Detective Sergeant Anderson spoke to Colima–Monge and obtained identification from him. Detective Sergeant Gray then asked Colima–Monge and Delgado if they were carrying any guns or drugs. Colima–Monge was asked and consented to be personally searched. Detective Sergeant Anderson found no contraband on Colima–Monge. Detective Sergeant Gray asked Delgado, the driver and owner of the 1989 Ford Probe, if he would consent to a search of the vehicle. Delgado consented

and did not limit the search of the vehicle in any way. The officers briefly searched the passenger area of the vehicle. They found no drugs. Detective Sergeant Gray then asked Delgado if they could search the trunk. Delgado gave his consent. When Detective Sergeant Anderson found a plastic bag in the trunk area of the hatchback car, immediately behind the right rear passenger seat, Detective Sergeant Gray asked Delgado if he could look in the bag. Delgado again gave his consent. Detective Sergeant Gray asked Delgado what was in the bag, and Delgado replied that it contained his socks. Inside the bag were a package of underwear and an opened package of men's stockings. Heroin had been wrapped in one of the stockings.

The rear seats of the 1989 Ford Probe fold forward, giving access to the trunk area. The rear passenger seat was not latched into its upright position when Detective Sergeant Anderson began to search the vehicle.

After finding the heroin, the officers handcuffed Colima–Monge and Delgado. Detective Sergeant Gray and Detective Sergeant Anderson agree, however, that Colima–Monge and Delgado would not have been allowed to leave even before the heroin was found. Detective Sergeant Gray gave the *Miranda* rights to each man individually in Spanish in the following way: Delgado was the first man advised; after Delgado acknowledged that he understood his rights, Detective Sergeant Gray advised Colima–Monge in Spanish in the same manner. Detective Sergeant Gray first asked each man if he could read Spanish. When each responded that he could read Spanish, Detective Sergeant Gray asked each one to read a Spanish language version of the *Miranda* rights out loud. Both men were able to correctly read the card out loud at a normal speed. Then Detective Sergeant Gray asked each man if he understood his rights. Colima–Monge said "yes," and Delgado said "si." Tr. 388. Detective Sergeant Anderson was a witness to the men reading the Spanish *Miranda* warnings out loud and stating that they understood their rights.

The officers took Colima–Monge and Delgado to the Justice Center in downtown Portland, Oregon where they acted as a team

to question the men one at a time. Detective Sergeant Anderson does not speak Spanish, so Detective Sergeant Gray translated for him.

The officers first questioned Delgado. Much of this interview was conducted in English because Delgado started speaking English. After initial denials, Delgado admitted that the drugs belonged to him. He said that Colima–Monge knew nothing about the drugs and had just flown in from California that morning. Delgado offered to provide information about his drug supplier in exchange for "a deal."

The officers then interviewed Colima–Monge in Spanish. Colima–Monge first denied knowing that there were drugs in the car or that Delgado was involved in selling drugs. Colima–Monge's story changed during the questioning after the officers falsely told Colima–Monge that Delgado had implicated him. Colima–Monge then admitted that he knew that a sale of eight ounces of heroin was going to happen. Colima–Monge also admitted that he acted as the lookout.

After the officers had completed their questioning of Colima–Monge, they interviewed Delgado for a second time. They told Delgado that Colima–Monge had admitted knowing about the drugs, and they falsely told Delgado that Colima–Monge admitted bringing the drugs to Oregon from the State of California. Delgado then stated that Colima–Monge had carried the drugs from the State of California in his suitcase.

Detective Sergeant Anderson testified that during the interviews, he had never become angry, never raised his voice, never slammed his fist into his hand, and never cursed. Detective Sergeant Anderson testified that Colima–Monge did not appear to be intimidated during the interview and did not show outward signs of being frightened, but that he had appeared to be nervous. Detective Sergeant Anderson testified that the interview at the Justice Center, and not the waiting time, took approximately one-half hour. Detective Sergeant Gray testified that he had remained calm during the interview, and that Colima–Monge appeared calm and fairly relaxed. Detective Sergeant Gray testified that he had no problems communicating with Colima–Monge in Spanish and did not notice any problems with his intelligence; that he and Detective Sergeant Anderson would have been wearing their weapons during the interviews, but that they were probably concealed; that he could not remember what he wore that day, but that he normally wears a shoulder holster with something over it, such as a vest or jacket. Defendant's Exhibit 3 shows Detective Sergeant Gray with a vest over a short-sleeve shirt. Colima–Monge was not handcuffed during the interview and was seated at a table in a ten-feet by twelve-feet interview room.

Dr. Jesus Padilla, a clinical psychologist with two years of experience, evaluated Colima–Monge for five hours at some point after his arrest. Dr. Padilla concluded that Colima–Monge was intelligent enough to learn what his *Miranda* rights are but would not voluntarily and knowingly waive them. The following is a summary of Dr. Padilla's testimony.

Colima–Monge told Dr. Padilla that he did not read the *Miranda* rights card himself, but that the officers read it to him because Colima–Monge could not read or write in either English or Spanish. Dr. Padilla tested Colima–Monge's reading ability by asking him to read a sentence that said, "Close your eyes" in Spanish, but that Colima–Monge could only read the Spanish words for "your eyes" with difficulty and could not sound out the word for "close." Colima–Monge told Dr. Padilla that he had never been to school. Dr. Padilla does not believe that Colima–Monge could have read the Spanish *Miranda* card.

Dr. Padilla partially bases his opinion concerning the *Miranda* waiver on the fact that Colima–Monge was born and raised in Mexico where, according to Dr. Padilla, the law until 1972 was that anyone who is charged with a crime is guilty until he proves his innocence, and although the presumption is now that you are innocent until proven guilty, many rural Mexicans are not aware of the change. Dr. Padilla testified that many Mexican police officers are corrupt and will negotiate with a suspect as to the type of crime to be charged and the amount of bribe

to be paid to the police. Dr. Padilla likened this to what he considers the well-known practice in Chicago or New York of bribing police officers when stopped for traffic infractions. Dr. Padilla testified that Mexican citizens have no rights other than those that they can purchase.

Dr. Padilla testified that Colima–Monge believed the *Miranda* rights were that he should not speak to anyone until he spoke to the police; that Colima–Monge became confused when the officers continued to insist that he [Colima–Monge] knew something about the drugs after he claimed he did not; that Colima–Monge assumed that he really did not have the rights which were read to him; and that Colima–Monge did not understand why the officers kept questioning him after they told him that he had the right to remain silent. Colima–Monge told Dr. Padilla that he did not know his attorney would be paid for by others if he could not afford to hire one. Dr. Padilla also stated that for cultural reasons, Hispanics usually defer to an authority figure.

Dr. Padilla testified:

A. . . . [I]f a person is coerced into saying something or lied to or deceived into saying something, then accordingly they are—they are not. They don't have the capacity to waive *Miranda*

. . . .

A. That's right. So not only was he confused about *Miranda* and the intent of *Miranda* but also he was deceived, at least according to the police report.

Q. Okay. You've mentioned in your report that you considered it important that the police had lied to Mr. Colima about what his cousin [Delgado] had said?

A. That the police said that they lied to him, yes.

Tr. 792.

Colima–Monge told Dr. Padilla that he felt coerced and intimidated by the police officers during the interview. He reported to Dr. Padilla that the officers were pounding their fists into their hands, using profanity, and harassing him by continuing to insist that he knew the truth. Colima–Monge was uncomfortable being in a closed room with them.

Colima–Monge told Dr. Padilla that Detective Sergeant Gray's use of the Spanish language was poor and unclear but generally understandable.

Dr. Padilla gained his knowledge about police practices in Mexico by consulting with a cultural anthropologist in a group to which he belongs, New World Consultants, and from his friends and family. Dr. Padilla was born in Mexico and lived there until he was seven.

Dr. Padilla testified that he always looks for signs of malingering when he examines people. He became suspicious of Colima–Monge when Colima–Monge had to be prompted twice to state the month that comes after May. Dr. Padilla attributed this to nervousness rather than deceptiveness. Colima–Monge also told Dr. Padilla that he had come back to the United States during the summer of 1996 after a six-month stay in Mexico, but he had told Pretrial Services that he had not been to Mexico for quite some time.

Christina Castro, a legal interpreter and translator, testified concerning her translation of the Spanish version of the *Miranda* rights back into English. She stated that the Spanish version was awkward and could be confusing to a native speaker of Spanish. Castro translated some of the sentences in the Spanish version as follows:

1. I rendered you have the right to keep yourself in silence.

. . . .

3. You have the right to speak with an attorney and that he present during the questioning.

4. If you do not have a way to pay an attorney, the courts may assign or will assign one without any cost for you.

Tr. 820–25. Castro testified that the absence of diacritical marks in the Spanish version changes the meaning of some of the verbs. For example, in statement #4 above, the reader would not know whether the court *might* assign an attorney at no cost or, instead, the court *will* assign an attorney at no cost.

In rebuttal, the government called Larry Valladolid, an agent with the Immigration

and Naturalization Service and a native Spanish speaker. Valladolid testified that the Spanish version of the *Miranda* rights given to Colima–Monge is not a difficult statement to understand, and that the sentences used in it are very basic. In the opinion of Valladolid, the card used by the Portland Police Bureau, which is the version used with Colima–Monge, is superior to the Spanish *Miranda* card used by the federal Drug Enforcement Agency.

## DISCUSSION

### 1. *Suppression of the Heroin*

#### A. *Contentions of the Parties*

Colima–Monge contends that Delgado did not commit a traffic infraction worthy of citation and detention, and that the continued detention of the vehicle and its occupants after the completion of the business relating to the traffic infraction was unlawful. Colima–Monge also contends that there was no probable cause for the police officers either to believe that he was involved in a crime or to believe that the vehicle contained the heroin that Delgado was going to sell to Castillo.

The government contends that the police officers had probable cause to search the vehicle for drugs and to question both of the occupants because of the information that Detective Sergeant Gray had learned when he listened in on the conversations between Delgado and Castillo and because of Colima–Monge's actions at the El Tapatio Restaurant. The government contends that the facts here fit within the automobile exception for a warrantless search. The government also contends that the traffic infraction is an additional basis to justify the stop, and that the officers were free to request consent to search the vehicle during the traffic stop. Finally, the government contends that Colima–Monge does not have standing to contest the search of the vehicle because he has not established an expectation of privacy in that vehicle or the plastic bag containing the heroin.

#### B. *Analysis and Ruling*

The threshold question is whether Colima–Monge has standing to contest the search. A defendant only has standing to challenge a search of a vehicle on Fourth Amendment grounds if he has a subjective expectation of privacy in the area searched, and the expectation is one that society is prepared to recognize as legitimate. *United States v. Salazar*, 805 F.2d 1394, 1396 (9th Cir.1986). The burden of proof is on the defendant. *Rakas v. Illinois*, 439 U.S. 128, 131 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978). A passenger in a car who does not assert a property or possessory interest in the car or the property seized does not have standing to contest the search because he does not have a legitimate expectation of privacy. *Id.* at 148, 99 S.Ct. at 433.

The 1989 Ford Probe that was searched belonged to Delgado, not Colima–Monge. Colima–Monge had arrived from the State of California the morning of the search. He has not asserted an interest in the plastic bag containing the heroin, or in the other items contained in the bag. The socks in the bag were Delgado's socks. Colima–Monge did not object to the search. When Detective Sergeant Gray asked Delgado for permission to search the 1989 Ford Probe, Colima–Monge only shook or nodded his head. Tr. 623.

The court concludes that Colima–Monge was a passenger in the vehicle and has not asserted any type of interest in either the vehicle or the plastic bag containing the heroin. Thus, he does not have a legitimate expectation of privacy in the vehicle or the plastic bag containing the heroin, and he has no standing to contest the search of either. The court, however, will address the other arguments as if Colima–Monge had standing to contest the search.

The government contends that there was probable cause to stop and search the vehicle. Colima–Monge denies this and also argues that there was no probable cause to believe that he, as opposed to Delgado, was involved in a crime.

An investigatory stop must be justified by "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Alvarez*, 899 F.2d 833, 836 (9th Cir.1990), *cert. denied,*

498 U.S. 1024, 111 S.Ct. 671, 112 L.Ed.2d 663 (1991) (quotation omitted).

■ Here, Detective Sergeant Gray had listened to two telephone conversations in which Delgado had agreed to sell heroin and had stated that he had "it" with him. In Detective Sergeant Gray's mind, "it" meant that Delgado had the heroin with him. The court finds Detective Sergeant Gray's assessment of the situation reasonable, particularly in light of the fact that the location for the transaction was changed, and Delgado and Colima–Monge were headed for the new location. Thus, there was probable cause to stop the vehicle.

■ Officers may conduct a warrantless search of an automobile if there is probable cause to believe that it contains evidence of a crime. *Id.* at 839. The search may include the trunk and all containers in which there is probable cause to believe that evidence is concealed. "Probable cause exists if, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quotation omitted).

■ For the reasons stated above, there was probable cause for the police officers to believe that the 1989 Ford Probe contained evidence of a crime, the heroin itself. Ten ounces of heroin can be concealed almost anywhere within a car or its trunk and small enough to conceal in a plastic bag. Thus, there was probable cause to search the automobile, its trunk/hatchback area, and the plastic bag inside of the trunk.

Colima–Monge's next argument is that the traffic violation was of insufficient severity to justify the length of the stop and the extent of the investigation.

■ A traffic violation can support an investigatory stop, but the length and scope of the investigation are limited by the circumstances justifying the initial intrusion. *United States v. Kennedy,* 573 F.2d 657 (9th Cir.1978). Under Oregon law, a police officer "[m]ay stop and detain a person for a traffic infraction for the purposes of investigation reasonably related to the traffic in-

fraction, identification and issuance of citation." ORS 810.410(3)(b).

The constitutional reasonableness of a traffic stop for which probable cause exists depends on neither the actual motivations of the officers nor whether a reasonable officer under the circumstances would have made the stop for the stated reason. *Whren v. United States,* —— U.S. ——, ——, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996).

■ Here, Officer Marshall pulled Delgado over when Delgado "cut off" another car as he entered a turn lane. Even though Officer Marshall testified that he would not always cite a driver for this infraction, it is uncontradicted that Delgado violated the traffic laws of the State of Oregon when he changed lanes. Accordingly, there was probable cause for Officer Marshall's actions based on the traffic infraction. Under *Whren,* the fact that the police officers are looking for a traffic infraction as a pretext to justify a stop of an automobile does not affect the constitutionality of the stop.

Finally, Delgado consented to the search of the 1989 Ford Probe automobile, its trunk, and the plastic bag containing the heroin. Colima–Monge does not contend that Delgado did not consent voluntarily or that Delgado did not have the authority to consent to the search of his own car. The Fourth Amendment does not require an officer to inform a lawfully detained person that he is "free to go" before that person can voluntarily consent to a search. *Ohio v. Robinette,* —— U.S. ——, ——, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996).

In sum, there were several lawful justifications for the search of the 1989 Ford Probe automobile. The court concludes that the stop and search of the 1989 Ford Probe does not violate the Fourth Amendment rights of these defendants. Colima–Monge's motion to suppress the heroin found in that automobile is denied.

### 2. *Suppression of the Statements*

#### A. *Contentions of the Parties*

Colima–Monge contends that the statements that he made during the interview by Detective Sergeant Gray and Detective Ser-

geant Anderson were the fruits of his illegal detention and arrest. He further contends that he did not voluntarily, knowingly and intelligently waive his *Miranda* rights. Colima–Monge also contends that the police violated his *Miranda* rights by subjecting him to pre-*Miranda* questioning.

The government contends that Dr. Padilla's testimony should be discounted because there is evidence that Colima–Monge was not truthful with Dr. Padilla and because Dr. Padilla was overly influenced by the fact that the officers lied to Colima–Monge during the interview.

### B. *Analysis and Ruling*

Because the court has found that the stop and search of the Ford automobile were legal, it will not address Colima–Monge's argument that the statements that he made were the fruits of his illegal detention and arrest.

#### i. *Waiver of Miranda Rights*

The first issue is whether Colima–Monge was properly advised of his *Miranda* rights. The court finds that Colima–Monge read the Spanish language version of the card that contains *Miranda* rights out loud without stumbling over the words when Detective Sergeant Gray asked him to do so. Both Detective Sergeant Gray and Detective Sergeant Anderson testified to this. Dr. Padilla only briefly tested Colima–Monge's ability to read before determining that his ability to read was extremely limited. There is evidence that Colima–Monge was not totally truthful when he spoke to Dr. Padilla. For example, Colima–Monge told Dr. Padilla that the officers pounded their fists and used profanity to harass him. Detective Sergeant Gray and Detective Sergeant Anderson contradict this and have testified that the interview was very low-key and that they remained calm. Colima–Monge also had difficulty remembering that the month of June followed the month of May when he spoke to Dr. Padilla, even though Dr. Padilla found that Colima–Monge had average intelligence. Furthermore, Colima–Monge told Dr. Padilla information different from what he told Pretrial Services concerning his last visit to the United States. The court accepts as true the accounts of Detective Sergeant Gray and Detective Sergeant Anderson concerning the arrest of Colima–Monge.

Before law enforcement officials may question a suspect in custody, the officials must inform the suspect that he has a right to remain silent; that his statements may be used against him in a court of law; that he has the right to the presence of an attorney; and that if he cannot afford an attorney, one will be appointed for him prior to questioning. *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). To be valid, a waiver of *Miranda* rights must be voluntary, knowing and intelligent. *United States v. Bautista–Avila,* 6 F.3d 1360, 1365 (9th Cir.1993). Whether a waiver is valid depends on the totality of the circumstances, including the background, experience, conduct, age, and language difficulties of the defendant. *Id.; United States v. Bernard S.,* 795 F.2d 749, 751 (9th Cir.1986). The government must prove by a preponderance of the evidence that a suspect voluntarily waived his *Miranda* rights. *Colorado v. Connelly,* 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986).

Turning to the text of the Spanish language *Miranda* card, the translation of the Spanish language *Miranda* card into English produces awkward wording. Castro testified that the translation could be confusing to a native Spanish speaker. Valladolid, however, a native Spanish speaker, testified that the card is not difficult for a native Spanish speaker to understand.

> We have never insisted that *Miranda* warnings be given in the exact form described in that decision.... [N]o talismanic incantation [is] required to satisfy its strictures.
>
> ... Reviewing courts therefore need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably conve[y] to [a suspect] his rights as required by *Miranda.*

*Duckworth v. Eagan,* 492 U.S. 195, 202–03, 109 S.Ct. 2875, 2880, 106 L.Ed.2d 166 (1989) (quotations, citations, and footnotes omitted). Although the Spanish translation is appar-

ently not a model of good grammar, the court concludes that the problems with it as explained by Castro are not severe enough to preclude it from reasonably conveying the rights to a Spanish-speaking suspect to which he is entitled. As stated above, the court finds that Colima–Monge was not truthful with Dr. Padilla, and it has discounted Colima–Monge's statements to Dr. Padilla that he thought he was not to speak to anyone before he spoke to the police and that he did not know that an attorney would be provided to him at government expense.

 The court now turns to whether Colima–Monge voluntarily, knowingly and intelligently waived his *Miranda* rights. Colima–Monge concedes that he intelligently waived his rights but claims that he did not voluntarily and knowingly waive them. In summary, Dr. Padilla concludes that Colima–Monge, raised in rural Mexico without schooling and indoctrinated in the Mexican culture which gives a suspect no rights unless he bribes officials for them, cannot understand that the system is different in the United States and, thus, cannot voluntarily and knowingly waive his *Miranda* rights.

The court is guided by the following distinction:

> [T]he sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion.... Indeed, the Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion. The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on "free choice" in any broader sense of the word.

*United States v. Huynh,* 60 F.3d 1386, 1388 (9th Cir.1995)(quoting *Colorado v. Connelly,* 479 U.S. 157, 170, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986)) (internal quotation and citation omitted). In *Huynh,* the court concluded that a *Miranda* waiver by a Vietnamese woman was voluntary in spite of expert testimony that her South East Asian upbringing impressed upon her a survival instinct to do whatever she was instructed to do by authority figures. Colima–Monge's situation is very similar in that Dr. Padilla

testified that as a Hispanic raised in Mexico, Colima–Monge would defer to authority figures for cultural reasons.

The facts before this court are even more similar to *United States v. Bautista–Avila,* 6 F.3d 1360 (9th Cir.1993). There, a Mexican defendant with a sixth grade Mexican education, sole work experience as a manual laborer, and no experience with the United States judicial system, indicated that he understood his *Miranda* rights. An expert witness testified that the defendant was unable to grasp abstractions and, thus, could not make a knowing and intelligent waiver of his *Miranda* rights. The court concluded that the defendant could make a knowing and intelligent waiver despite the expert's opinion to the contrary. The court particularly noted that the defendant stated that he understood his rights after they were explained. *Id.* at 1366.

There is no evidence of overreaching by the police. Colima–Monge told Detective Sergeant Gray that he understood his *Miranda* rights before he was interviewed at the Justice Center. Dr. Padilla was heavily influenced by the fact that Detective Sergeant Gray used the interview technique of lying to Colima–Monge about admissions supposedly made by Delgado concerning Colima–Monge's involvement. Dr. Padilla stated that a person does not have the capacity to waive *Miranda* rights if he is lied to. The deception occurred, however, well after Colima–Monge stated that he understood his *Miranda* rights. Moreover, deception has been approved as an interview technique. *See United States v. Miller,* 984 F.2d 1028, 1031 (9th Cir.1993). The court concludes that the government has proven by a preponderance of the evidence that Colima–Monge voluntarily, knowingly and intelligently waived his *Miranda* rights.

ii. *Voluntariness of Confession*

Colima–Monge contends that the confession was involuntarily given and should be suppressed.

When considering whether a confession is voluntary, a court must consider the totality of the circumstances. *United States v. Bautista–Avila,* 6 F.3d 1360, 1364 (9th Cir.1993).

A confession is involuntary "if it is extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Id.* (quotation omitted). A confession obtained by physical violence is *per se* involuntary; a confession obtained by psychological coercion is not. *United States v. Miller,* 984 F.2d 1028, 1030 (9th Cir.), cert. denied, 510 U.S. 894, 114 S.Ct. 258, 126 L.Ed.2d 210 (1993). When there is alleged psychological coercion, the issue is whether the defendant's will was overborne when he confessed. *Id.* at 1031. Deception does not render a confession involuntary. *Id.*

■ There is no evidence here of physical coercion. The court has found that Detective Sergeant Gray and Detective Sergeant Anderson did not pound their fists or use profanity when they interviewed Colima–Monge. Although the officers lied to Colima–Monge when they said that Delgado had implicated Colima–Monge in the crime, this deception does not make Colima–Monge's confession involuntary. There is no evidence of threats against Colima–Monge, including his ability to see his family in the future. The interview took about one-half hour. The officers pressed him in order to ascertain his involvement in the drug transaction, even after his initial denials, but continuing to ask questions for well under an hour does not drag an interview out so long that an innocent suspect will confess in an effort to end the interview. The officers wore their guns during the interview; there is no evidence, however, that the guns were visible to Colima–Monge. Colima–Monge told Dr. Padilla that he was able to understand Detective Sergeant Gray's Spanish. The officers testified that Colima–Monge appeared calm. The court concludes that Colima–Monge did not confess because his will was overborne. The court finds that his admissions were freely and voluntarily made.

### iii. *Pre–Miranda Questioning*

■ Colima–Monge contends that the statements he made after he was advised of his *Miranda* rights were the fruits of in-custody questioning conducted prior to being advised of his *Miranda* rights. Colima–

Monge relies on *Pope v. Zenon,* 69 F.3d 1018 (9th Cir.1995), *as amended on denial of rehearing* (1996), in which detectives arrested the defendant, confronted him with evidence that his fingerprint was on a document linking him to the crime, and asked him how that had happened. In response, the defendant made incriminating statements. The incriminating statements tool, place before the detectives had advised the defendant of his *Miranda* rights. The defendant confessed again after being advised of his *Miranda* rights. The court held that the post–*Miranda* confession was not voluntary but was directly induced by the prohibited pre–*Miranda* questioning and should have been suppressed. *Id.* at 1023.

The facts in *Pope* are distinguishable from the facts before this court. Here, the only pre–*Miranda* questioning was conducted when the officers asked Colima–Monge and Delgado if there were drugs or weapons in the car and if they could search the car. This kind of questioning is a common occurrence during traffic stops. *See Ohio v. Robinette,* —— U.S. ——, ——, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996) (Fourth Amendment does not require an officer to inform a lawfully detained person that he is "free to go" before that person can voluntarily consent to a search). Asking persons detained about possible drugs or weapons is quite different from confronting a suspect with his fingerprint on an incriminating document and asking how his fingerprint got there, as was done in *Pope.* The questions asked to Colima–Monge about drugs and weapons were extremely general and did not point to the specific crime being investigated. The court concludes that the questioning of Colima–Monge at the scene of the arrest would not have directly induced his later statements at the Justice Center. Accordingly, the pre–*Miranda* questions did not make the post–*Miranda* statements involuntary.

### CONCLUSION

The motion of Colima–Monge to suppress evidence (# 12) (1 & 2) is denied.