**Charles S. POPE, Petitioner–Appellant,**

v.

**Carl ZENON, Superintendent, OSCI, et al., Respondents–Appellees.**

No. 93–35164.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 7, 1994.

Decided Nov. 7, 1995.

As Amended on Denial of Rehearing
Jan. 4, 1996.

Dennis N. Balske, Assistant Federal Public Defender, Portland, Oregon, for petitioner-appellant.

Robert M. Atkinson, Assistant Attorney General, Salem, Oregon, for respondents-appellees.

Before: POOLE and TROTT, Circuit Judges, and KING,* District Judge.

TROTT, Circuit Judge:

Charles S. Pope is a convicted murderer serving a life sentence in an Oregon penitentiary. He timely appeals the district court's denial of his petition for a writ of habeas corpus. His principle claim is that evidence obtained by homicide detectives in violation of the rules of custodial interrogation established by the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), fatally tainted his conviction. Although we agree with Mr. Pope that the detectives violated *Miranda* by subjecting him to custodial interrogation before advising him of his constitutional rights, and that it was error to use the traceable product of this improper interrogation against him, we are convinced that this transgression did not—under the facts and circumstances of this case—have any "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, ——, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993). Accordingly, we affirm the district court's denial of his petition.

I

The Interrogation

The pertinent facts inevitably provide an essential part of the means required to assess a claim such as Mr. Pope's. As George Williams once noted, "The continued success of flying fishes ... absolutely depends upon their propensity for falling back into the water after they emerge." [1] Thus, we begin with a review of what happened to Mr. Pope after the police arrested him for the murder in the Majestic Hotel of James Kennedy. Charles Kokes, one of Mr. Pope's prosecutors, will outline the story for us as he did to the state trial judge in a pretrial suppression hearing.

Initially, when the detectives went in and talked to the defendant, before they advised him of his Miranda rights, they had a couple of pieces of evidence. They had his signature on a booking document from a previous booking and they had his signature on a registration card from the hotel where the homicide occurred. They confronted him with the signatures and asked him about his handwriting and whether it was the same. I believe they also confronted him with the fact that they had found a fingerprint on the registration card. So the defendant's responses to those statements will be an issue, I suspect, as no Miranda rights were read prior to that initial confrontation with the defendant.

Then the defendants were [sic] advised of their rights per Miranda. The defendant made the initial brief admission that he knew what it was about and he had stabbed this man. That, in conjunction with his questions about his rights. So an issue will be whether that statement is a voluntary, spontaneous statement.

Then the officer's Miranda clarification. The defendant had asked, "Do I get a lawyer now?" is the question he asked. The detectives told him when a lawyer would be appointed. And after that, the defendant made a second, more detailed

---

* The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

1. Stephen Jay Gould, *An Urchin in the Storm* (1987).

admission to the detectives. So this statement occurs after the clarification, after the *Miranda* rights advisal.

Finally, the last statement that I can tell will be in contention is the taped admission that the Court will hear. Prior to the taped admission there was a complete re-advisal of Miranda and a complete reclarification of the issue of the availability of a lawyer and when he would get one. So those four statements are all in a different posture.

I would like to put on my evidence and the attempt to make sense of how they all fit together.

In that same suppression hearing, Detective McDonald then filled in the details.

Q (By the Prosecutor) Which Detective Division are you assigned to?

A (By Detective McDonald) I'm assigned to the homicide detail.

Q Were you the assigned detective to investigate a homicide, a person named James Edward Kennedy?

A Yes.

Q Pursuant to that investigation on the 22nd of July of 1986 at about 3:45 p.m., did you and detective Kent Perry interview the defendant Charles Pope at the Justice Center?

A Yes, we did.

Q Prior to advising the defendant of his rights per Miranda, did you or Detective Perry speak to the defendant?

A Yes, I did.

Q Would you describe to the Court what that conversation consisted of, including any responses that the defendant may have made.

A We escorted the defendant from a holding room to an interview room where Detective Perry joined us. I initially introduced ourselves and told him who we were, that we were detectives. I told him that we were conducting a criminal investigation and that that investigation had linked him to the crime we were investigating.

I then showed him a photocopy of a fingerprint card used by our Identification Division that showed rolled ink finger-

prints of an individual on the card that said "Charles Pope." I asked the defendant if that was his signature on the bottom of the card and he told me that it was.

I then showed him a registration card from the Majestic Hotel which also bore the signature Charles Pope, and I asked him if that was his signature on that document and he said it was. I then informed him that a latent fingerprint had been obtained from the hotel registration card and that that fingerprint had been compared with a fingerprint from the card, which I also had showed him, and as a result of that comparison the fingerprint on the registration card had been positively identified as being one of his fingerprints. I asked him if he understood that concept and he said that he did.

Q Was this information that you gave to the defendant, was that correct information? Was that true?

A Yes, it was.

Q Go ahead.

A At that point I asked Mr. Pope if he could read and write English and he said that he could. I then advised him of his constitutional rights. I did so by providing him with a copy of a Rights Advice Form.

\* \* \* \* \* \*

Q Okay. That is a true and accurate representation of the copy that you handed to the defendant in this case?

A Yes, it is. After providing him with the original of this form, I instructed him to read the contents of the form to himself silently. I simultaneously read aloud from an identical form. I read the contents of the form verbatim. After reading the form, I asked him if he understood each of his Constitutional rights. He told me that he did.

\* \* \* \* \* \*

Q After the defendant indicated that he understood his rights, Detective, did you ask him if he was willing to speak with you?

A Yes, I did.

Q What did he say?

A His initial statement was he said, "What about No. 3?" directing our attention to the Rights Advice Form.

Q He was referring to the No. 3 sentence on the rights form?

A Yes. The No. 3.

Q Go ahead.

A His statement to us then was, "Do I get an attorney now?" And he followed that up by saying, "I don't have the money to pay for one." He continued speaking. He didn't stop after that point and wait for either of us to respond to his questions. He continued his sentence and his statement and told us, "I know what this is about." He said, "A guy came onto me and yes, I did stab him." He said, "I just kind of freaked out on the guy, but I only stabbed him once." When he finally did finish his statement, Detective Perry went back and responded to his question, his law of clarification on the rights form.

Detective Perry was Detective McDonald's partner. Immediately after Mr. Pope's initial incriminating statements about stabbing Mr. Kennedy, Detective Perry responded to Mr. Pope's question regarding whether he "[got] an attorney *now*." (emphasis added).

Q (By the Prosecutor) After he indicated he understood verbally and signed the form, did either of you ask him if he wished to make a statement to you?

A (By Detective Perry) Yes.

Q Which one of you asked that question?

A I believe McDonald did.

Q What did the defendant say at that point?

A He said—I am quoting here—"What about No. 3?" which I took as a reference to Point No. 3 on the Miranda form. They are divided into four points. He said, "Do I get an attorney now? I don't have the money to pay for one." And then he kept talking and said, "I know what this is about. A guy came onto me and yes I did stab him. And I kicked in his face a little bit. I just kind of freaked out on the guy, but I only stabbed him once."

Q After he made the statement, did you answer his questions concerning his rights?

A Yes.

Q What did you tell him about his rights at that point?

A I told him that he would be arraigned *tomorrow*, which would be the 21st at two o'clock in the afternoon, and that *an attorney then would be routinely appointed for him.* If he didn't have the money [to] pay for one, he needn't be concerned about it. This would be no expense.

Q The defendant's question was, "Do I get a lawyer now," is that right?

A Yes.

Q One of his questions?

A *"Do I get an attorney now?" That's correct.*

Q Did, did he say, "Can I have an attorney now?"

A No.

Q So that's when you told him an attorney would be appointed the next day at no expense to him; is that right?

A I told him that *after* he said everything that he said initially there including that he knew what it was about and what he had done.

(emphasis added).

After Detective Perry answered Mr. Pope's question, Detective Perry asked him if he would make a statement regarding the murder. Mr. Pope agreed to this request and then gave a detailed account of his participation. Then, the detectives asked him if he would give them a tape-recorded statement, which he did. At the outset of this final statement, the detectives again advised Mr. Pope of his *Miranda* rights, and he signed an acknowledgment form and said that the detectives had satisfactorily answered his earlier questions about an attorney.

The parties do not dispute these facts, only their legal implications.

## II

### The Use of the Statements

At the conclusion of the pretrial suppression hearing, the trial court ruled that petitioner's three statements, which are charac-

terized as "confessions," could be used against him. The court held that Mr. Pope had knowingly and voluntarily waived his *Miranda* rights prior to the statements. However, the state offered only Mr. Pope's first statement during its case in chief and used his subsequent detailed statements only after he testified on direct examination.

## III

### Analysis

■■■ *Before* the police can subject a suspect in custody to interrogation, they must advise that person of his constitutional rights; and they must make it clear to a suspect that he has the right to talk to an attorney *before* questioning and to have that attorney present *during* the interrogation. The purpose of this requirement—which appears as "No. 3" on the detectives' advisement form—is to protect the suspect's Fifth and Fourteenth Amendment privilege against compulsory self-incrimination. Moreover, interrogation means questioning or "its functional equivalent," including "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980).

■■■ In the instant case, the police violated these rules. The police had arrested Mr. Pope for the murder of Mr. Kennedy, and he was in custody at the police station. Detectives McDonald and Perry approached him for the purpose of interrogating him about the murder, but they failed to advise him of his rights *before* the questioning began. In direct response to this improper questioning, which included confronting Mr. Pope with documentary circumstantial evidence of his guilt, he directly incriminated himself by admitting that the signatures on both the fingerprint identification card and the highly probative and incriminating Majestic Hotel registration card for the room where the murder occurred were indeed his. *Miranda* aptly describes the tactic used by the detectives:

To highlight the isolation and unfamiliar surroundings, the [interrogation] manuals instruct the police to display an air of confidence in the suspect's guilt and from outward appearance to maintain only an interest in confirming certain details. The guilt of the suspect is to be posited as a fact.

. . . .

To be alone with the suspect is essential to prevent distraction and to deprive him of any outside support. The aura of confidence in his guilt undermines his will to resist. He merely confirms the preconceived story the police seek to have him describe.

384 U.S. at 450, 455, 86 S.Ct. at 1615, 1617.

To quote Justice Brennan,

Interrogators describe the point of the first admission as the "breakthrough" and the "beachhead," R. Royal & S. Schutt, The Gentle Art of Interviewing and Interrogation: A Professional Manual and Guide 143 (1976), which once obtained will give them enormous "tactical advantages," F. Inbau & J. Ried, Criminal Interrogation and Confessions 82 (2d ed. 1967).

*Oregon v. Elstad,* 470 U.S. 298, 328, 105 S.Ct. 1285, 1303, 84 L.Ed.2d 222 (1985) (Brennan, J., dissenting).

Detectives McDonald and Perry used this beachhead tactic when they interrogated Mr. Pope before advising him of his rights. The improper interrogation approach they used in combination with telling him they had his fingerprints on the registration card linking him to the murder set him up to talk to them notwithstanding their advisement of rights; and talk to them he did. The first words he uttered were, "I know what this is about." Of course he did. The detectives had just unlawfully caused him to implicate himself in the crime. Obviously, their interrogation extracted more than just the direct answers to the detectives' questions, and to argue that Mr. Pope just blurted out a confession after being advised of his rights simply distorts the facts. As demonstrated by the quoted record, we have no difficulty concluding that Mr. Pope's so-called "spontaneous statements" were directly induced by Detectives McDonald's and Perry's prohibited interrogation tactics. Any alleged state court finding of fact to the contrary is clearly erroneous, and any conclusion of law that Mr.

Pope's confession was not the product of interrogation, but "volunteered" as defined in *Miranda,* 384 U.S. at 478, 86 S.Ct. at 1629, and *Edwards v. Arizona,* 451 U.S. 477, 485, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981), is equally wrong. Under the plenary review mandated by the Supreme Court, Oregon's treatment of these issues was inadequate. *See Collazo v. Estelle,* 940 F.2d 411, 420–21 (9th Cir.1991) (en banc) (finding linkage between a *Miranda* violation and a subsequent statement).

■ In addition, on these facts the intervening advisement of rights did not effectively sever the first confession from the previous interrogation or provide a basis on which to find an implied waiver. The fact that the detectives successfully interrogated Mr. Pope without a lawyer being present and then told him he had a right not to be subjected to what they had done to him influences our analysis. To construe under these cognitively dissonant circumstances his immediate confession as an *implied* waiver of his rights that had just been violated would be fanciful, an exercise in form over substance at best. A contrary holding would only encourage police to resort to unacceptable tactics to circumvent *Miranda. See Collazo,* 940 F.2d at 423 (the purpose of the exclusionary rule is to compel respect for the Constitution).

In effect, the tactic of using pre-advice interrogation to open up a suspect worked, which is precisely why we disapprove of it as undermining *Miranda* and the rights *Miranda* seeks to protect. The police should know this "practice ... is reasonably likely to evoke an incriminating response from a suspect," *Innis,* 446 U.S. at 301, 100 S.Ct. at 1689–90; and it did. The conduct of the police in this case is precisely what the Supreme Court had in mind in *Oregon v. Elstad,* 470 U.S. 298 (1985) when it exempted "deliberately coercive or improper tactics in obtaining the initial statement" from the ordinary rule that subsequent statements are not to be measured by a "tainted fruit" standard, but by whether they are voluntary. *Id.* at 314.

Moreover, when Detective Perry did answer Mr. Pope's question about when he would get a lawyer, the answer as measured by *Miranda* was wrong and misleading. By telling Mr. Pope he would get an attorney the next day, Detective Perry nullified Detective McDonald's *Miranda* admonition that Mr. Pope had the right at no expense to talk to "a lawyer *before* we ask any questions and have him present while being questioned." (emphasis added). To so conclude, one must merely look at the detectives' testimony to see in black and white that they understood Mr. Pope's question to refer to the right to consult an attorney *before* questioning and to have the attorney present during the process, *not* that they believed Mr. Pope was inquiring about subsequent representation in court:

A (By Detective McDonald) His initial statement was he said, "What about No. 3?" *directing our attention to the rights form.*

Q (By the Prosecution) He was referring to the No. 3 sentence *on the rights form?* ["You have the right to talk to a lawyer before we ask you any questions and have him present while you are questioned."]

A Yes. The No. 3.

(emphasis added).

Detective Perry's understanding was the same: "[Mr. Pope] said—I am quoting here—'what about No. 3?' *which I took as a reference to Point No. 3 on the Miranda form."*

How anyone could have been persuaded in the suppression hearing that the appropriate answer to Mr. Pope's question about No. 3 was to tell Mr. Pope he would get an attorney "tomorrow" transcends all understanding. The operative rule entitles a suspect, at no expense, to consult an attorney *before* questioning, not "tomorrow." Mr. Pope's *subsequent* statement to the detectives that his question had been satisfactorily answered does not mitigate Detective Perry's misguided response. What Mr. Pope *may* have *thought* at that time compared to what had been said, is irrelevant.

On its facts, this case is distinguishable from *Duckworth v. Eagan,* 492 U.S. 195 (1988), because here, Mr. Pope asked a specific question about his right to have a lawyer present *before and during questioning.* It was the nature of this question that rendered Detective Perry's answer both wrong and misleading because it obscured Mr. Pope's *Miranda* right to consult with counsel *prior* to interrogation. Accordingly, this case is

more like the situation *California v. Prysock* discusses where "the [advisement] reference to appointed counsel [is inappropriately] linked to a future point in time after police interrogation." 453 U.S. 355, 360 (1981).

In summary, although we do not find Mr. Pope's confession immediately following the advice of rights to be involuntary, we do conclude it was not volunteered or spontaneous, but instead the direct and unmistakable product of impermissible interrogation. As such, the admission in evidence of his initial statement was error of a dimension cognizable in a federal habeas proceeding.

## IV

### The Effect of the First Confession

■ We now analyze whether the erroneous admission in evidence of Mr. Pope's initial brief confession identifying himself as James Kennedy's killer had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at ——, 113 S.Ct. at 1722. After *Arizona v. Fulminante*, 499 U.S. 279, 284–85, 111 S.Ct. 1246, 1251, 113 L.Ed.2d 302 (1991), such an analysis applies even to coerced confessions. But, we conduct this analysis with an awareness that "a confession is like no other evidence," and that a full confession may have a "profound impact" on the trier of fact. *Id.* at 296, 111 S.Ct. at 1257.

Based on such a review, we are certain that the use of Mr. Pope's confession in this case did not have any substantial or injurious effect or influence on the jury.[2] We so conclude for three reasons.

First and foremost, Mr. Pope's defense did not rely on a claim that he did not stab James Kennedy. In fact, counsel for Mr. Pope freely admitted that his client killed the named victim. Rather, the defense was diminished capacity caused by intoxication, an appropriate state of mind defense designed to reduce the defendant's culpability to something less than aggravated murder. If successful, such a defense would end the State's attempt to subject Mr. Pope to the death penalty. In defense counsel's own words from his closing argument,

I would suggest to you, however, in this case the evidence has been clear to support the defendant's defense as it were of diminished intent. He's not asking you to find him not guilty, and walk him out of here and hold him completely not responsible for the death of James Kennedy. In fact, from the very first time he was interviewed by the police, he has acknowledged his responsibility for participating in the conduct that in some way contributed to the death of James Kennedy. So it's not a question of him trying to avoid that. The only question is what is his responsibility and that's what you must focus on.

\* \* \* \* \* \*

Ladies and gentlemen, the most significant thing about this case in terms of physical evidence, I would suggest, is that Charles Pope has said throughout that the first stab wound was from [codefendant] Wolford and that he [Mr. Pope] was standing over in the corner. And that it was only after the man was down on the floor and that he [Mr. Pope] got the knife some way from Wolford that he stabbed him.

Second, the record contains abundant persuasive evidence that the defendant stabbed James Kennedy in the Majestic Hotel, evidence unrelated to the defendant's confession to the police. Such evidence includes Mr. Pope's possession when arrested of Mr. Kennedy's watch, as well as his separate confession to his friend Charles Edwards of personal complicity, not to mention a mountain of damning circumstantial evidence.

Third, Mr. Pope's description in his inadmissible confession of his state of mind was not directly inconsistent with his defense of diminished capacity. In that confession, Mr. Pope describes himself as having "freaked out." His defense was not that he was unconscious, but that he was too drunk to form the specific intent required by law for aggravated murder.

Based on this record, we conclude that the error in admitting Mr. Pope's confession was absolutely "unimportant in relation to everything else the jury considered on the issue in question." *Yates v. Evatt*, 500 U.S. 391, 403, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991). Thus, the petitioner is unable to make the showing of substantial and injurious effect required by *Brecht*.

---

**2.** The district court did not admit Mr. Pope's admissions made before the advisement of his rights.

## V

### The Subsequent Statements

■ Mr. Pope claims this court should grant his petition on a second ground: that the district court admitted his second and third confessions as rebuttal evidence without a limiting instruction that they could be used only for impeachment purposes. As authority for this claim he offers *Harris v. New York*, 401 U.S. 222, 225–26, 91 S.Ct. 643, 645–46, 28 L.Ed.2d 1 (1971) (evidence obtained in violation of *Miranda* may be used for impeachment); and *Oregon v. Hass*, 420 U.S. 714, 723–24, 95 S.Ct. 1215, 1221–22, 43 L.Ed.2d 570 (1975)(same).

■ The first problem with this claim is that trial counsel did not request such an instruction. In fact, for tactical reasons Mr. Pope's attorney conceded the statements the state offered were admissible as substantive evidence

> going to defendant's intoxication and ability to recall and remember at the time. And for those purposes, I concede they are admissible, *as long as they are not being offered as impeachment and argued for those purposes as impeachment evidence,* then I would not object.

(emphasis added). Clearly, counsel did not want the court to suggest to the jury that the confessions might *impeach* his main defense. Moreover, a failure to request an instruction bars review of the issue by Oregon appellate courts, absent extraordinary circumstances. *See Oregon v. Brown*, 310 Or. 347, 800 P.2d 259, 265 (1990).

■ The second defect in this claim is that the defense did not assert it in any form in any proceeding in state court, either on direct appeal or as a ground for post-conviction relief.[3] If a petitioner fails to raise a claim in state court, federal courts will not address it on habeas unless there exists a showing of cause and prejudice for the failure. *See Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977); *Coleman v. Thompson*, 501 U.S. 722, 724, 111 S.Ct. 2546, 2551, 115 L.Ed.2d 640 (1991). No such showing has been made. On this rec-

ord, we conclude that this belated and manifestly flawed claim is not properly before this court.

## CONCLUSION

We affirm the district court's denial of Mr. Pope's petition for a writ of habeas corpus.

---

**3.** Petitioner directly appealed his conviction, but the Oregon Court of Appeals affirmed without opinion, *Oregon v. Pope*, 92 Or.App. 592, 760 P.2d 904 (1988), and the Oregon Supreme Court denied review. 307 Or. 78, 763 P.2d 732 (1988).

Petitioner filed a petition for post-conviction relief in *Pope v. Zenon*, Marion County Case No.

89C–10522, but the court denied relief. The Oregon Court of Appeals affirmed without opinion, *Pope v. Zenon*, 104 Or.App. 447, 800 P.2d 1093 (1990), and the Oregon Supreme Court denied review, 311 Or. 150, 806 P.2d 128 (1991).