of a default and a calling of the letter of credit.

## III.

Had the facts described above been adduced in a criminal bank fraud trial, they surely would have been sufficient to justify the giving of a willful blindness instruction. These same facts thus should be regarded as adequate to ground the trial court's determination that Normand did not justifiably rely on Gallo's forgery because Normand effectively ignored a warning that Gallo had forged his wife's signature to the loan documents. Alternatively, these facts should be regarded as sufficient to warrant a remand for inquiry into whether Normand relied in fact on Gallo's forgery.

I dissent.

**UNITED STATES of America, Appellee,**

v.

**Kevin CONLEY, Defendant, Appellant.**

**No. 97–1425.**

United States Court of Appeals,
First Circuit.

Heard July 29, 1998.

Decided Sept. 11, 1998.

---

J. Bradford Coffey, with whom Farrell, Rosenblatt & Russell was on brief, for appellant.

Jennifer Zacks, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief, for the United States.

Before TORRUELLA, Chief Judge, WELLFORD,* Senior Circuit Judge, and SELYA, Circuit Judge.

SELYA, Circuit Judge.

In this criminal appeal, defendant-appellant Kevin Conley asks us to set aside his conviction for conspiring to possess marijuana with intent to distribute, *see* 21 U.S.C. §§ 841(a)(1), 846 (1994), on the ground that the admission into evidence of certain statements which he made at the time of his arrest violated his Fifth Amendment rights. We reject the appellant's Fifth Amendment construct, as well as his claim that the lower

* Of the Sixth Circuit, sitting by designation.

court erred when imposing sentence. Consequently, we affirm the judgment below.

## I. BACKGROUND

During the summer of 1995, postal inspectors received information that sizable quantities of marijuana were being shipped from San Diego, California, to central Massachusetts. When the postal inspectors launched an investigation, a series of packages addressed to one Richard Simms at 5 Valley St., Webster, Massachusetts, aroused their suspicions; Simms did not live at 5 Valley St. and the packages bore apocryphal return addresses. To further their probe, the postal inspectors monitored the delivery of one such package to the Valley St. address. An individual named Jeffry Taberski signed for it on October 19, 1995.

In November 1995, a narcotics-sniffing dog detected drugs in another parcel headed for 5 Valley St. The postal inspectors obtained a warrant authorizing them to intercept and open that package. Upon finding that it contained marijuana, the inspectors resealed it and effected a controlled delivery. When Taberski signed for this parcel, the postal inspectors immediately arrested him.

Taberski told the lawmen that he worked for "Kevin C." as a receiver of shipments. He also informed them that, shortly before his arrest, he had advised "Kevin" of the package's imminent arrival and had been told that "Kevin" would retrieve it the next day (November 8, 1995).

Postal inspectors Michael Blanchard and William Kezer returned to 5 Valley St. on November 8. At around 8:30 a.m., the appellant arrived. Blanchard confronted him at the door to the apartment. When the appellant identified himself as Kevin Conley, Blanchard asked him to step inside and proceeded to arrest him. A brief exchange followed, during which Blanchard searched the appellant, unearthing $500 in cash. The appellant identified the cash as his and asked Blanchard why he had been detained. Blanchard replied that he had been arrested for drug trafficking. After this colloquy, Blanchard read the appellant his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The appellant became increasingly nervous and openly pondered calling an attorney. At that point, Inspector Kezer reentered the apartment. He and Blanchard discussed searching Conley's home, but decided to wait for a warrant. Without prompting, the appellant consented to the search and stated that the postal inspectors might find some cash and a small amount of marijuana. Blanchard and Kezer told Conley that they would await a warrant.

Soon thereafter, the appellant spontaneously exclaimed: "Well, geez, you know, maybe I think I should get an attorney." Blanchard and Kezer decided to treat this rumination as a request for counsel and told the appellant that they would not question him until he had secured legal representation. The postal inspectors attempted to locate a telephone book to assist the appellant in selecting a lawyer, but they were unable to find one. Kezer again left the apartment, but the appellant renewed his inquiries, beseeching Blanchard to tell him "what is going on" and "what have you guys got on me, what's this all about?" Blanchard reminded the appellant that he had requested an attorney and that this circumstance prevented the postal inspectors from entering into a dialogue with him. When Conley nonetheless persisted, Blanchard stated that if he (Blanchard) were to speak further, the appellant could not reply. Conley readily agreed to this condition.

Blanchard then limned the facts, mentioning other packages sent to other addresses. When he stated that a "Mr. Kubiak" had received some of these bundles, the appellant blurted out that he had used Kubiak in marijuana deals. Blanchard continued his recital, remarking that the postal inspectors knew the marijuana originated from the San Diego area but did not know the source. The appellant again interjected, this time recounting that he had lived in southern California for a spell and that it was quite easy to obtain marijuana there.

In due season, a federal grand jury indicted the appellant for possession with intent to distribute marijuana on nine separate occasions and conspiracy to commit that sub-

stantive offense. In advance of trial, the appellant moved to suppress in gross the incriminating statements that he had made at the time of his arrest. Judge Woodlock heard evidence and took the motion under advisement. He later refused to suppress the challenged statements and the government introduced some of them at trial (over the appellant's renewed objection).

The prosecution's case against the appellant was very strong, consisting of the inculpatory statements, the postal inspectors' observations, testimony from Taberski and Kellie Wright (who swore that her boyfriend, John Womack, had sent marijuana through the mail from San Diego to names and addresses in Massachusetts specified by the appellant), and considerable documentary evidence (e.g., mail tracking slips, telephone bills, and records of money transfers that Conley had made by wire to Womack and Taberski). Conley's defense centered around his claim that he was an innocent dupe who had done nothing more than allow Kubiak and Taberski to use his telephone. The jury returned a split decision, finding the appellant guilty on the conspiracy count but acquitting him on the nine substantive counts.

At the disposition hearing, Judge Woodlock adjusted the appellant's guideline sentencing range (GSR) upward for, *inter alia*, drug quantity and role in the offense. He then imposed a ninety-six month incarcerative sentence, a fine, and a four year period of supervised release. This appeal followed.

## II. THE SUPPRESSION MOTION

In the appellant's view, the lower court should have suppressed his incriminating statements because those statements were obtained without proper deference to his request for counsel. This argument draws its essence from *Edwards v. Arizona*, 451 U.S.

477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), a landmark decision in which the Supreme Court held that, once a suspect who is in custody invokes his right to confer with an attorney, continuing to interrogate him offends the Constitution. *See id.* at 484–85, 101 S.Ct. 1880. The government replies that no *Edwards* violation occurred for two reasons: first, the inspectors did not interrogate the appellant after he invoked his right to counsel, and, moreover, the appellant himself initiated the pivotal conversations.[1] In sifting through these contentions, we review the district court's findings of fact for clear error, while affording de novo review to the court's ultimate legal and constitutional conclusions. *See United States v. Schaefer*, 87 F.3d 562, 565 (1st Cir.1996); *United States v. Zapata*, 18 F.3d 971, 975 (1st Cir.1994).

■ We begin with constitutional bedrock. Absent special advisories by the police—including advice about the right to remain silent and the right to consult with counsel—the Fifth Amendment renders inadmissable most statements obtained by law enforcement officers during custodial interrogation. *See Miranda*, 384 U.S. at 478–79, 86 S.Ct. 1602. An arrest is the classic example of *Miranda*'s conception of custody, *see id.* at 444, 86 S.Ct. 1602, and the appellant's arrest is not disputed here.[2] The critical question, then, is whether the challenged statements were the product of interrogation, as that word is understood in constitutional jurisprudence. If not, no constitutional violation occurred; but if so, we must consider whether such interrogation transpired only after the appellant reinitiated the discussion. *See Edwards*, 451 U.S. at 484–85, 101 S.Ct. 1880 (stating that once an accused "expresse[s] his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the ac-*

---

1. The prosecution makes an alternate argument in which it suggests that 18 U.S.C. § 3501, rather than the *Edwards* rule, governs this case. Given our holding *infra* that the introduction of the evidence passes muster under *Edwards*, we need not reach this issue.

2. It is obvious, however, that the custodial circumstances in this case vary markedly from

those in *Miranda*. The place of the exchange between the defendant and the police was not in a police "special interrogation room"; the defendant was not "seriously disturbed"; and psychological pressures over a period of some time were not imposed. *Id.* at 456, 457, 86 S.Ct. 1602.

cused himself initiates further conversations with the police ") (emphasis supplied).

To the extent that the appellant accuses Blanchard and Kezer of not respecting his request for an attorney, the record belies his claim. Although the appellant's comments on the subject of whether he wanted an attorney were elliptical, the postal inspectors exercised commendable restraint and chose to treat them as a request for legal representation. At that moment, they not only declined to question Conley further, but also advised him of their position. This conduct fully satisfies the strictures of *Miranda* and *Edwards*.

■ The appellant next posits that Inspector Blanchard's comments regarding the facts of the case and the strength of the evidence constituted proscribed interrogation under the *Edwards* regime. We do not agree.

■ Interrogation, properly understood, involves either "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Accordingly, interrogation encompasses "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. 1682. Blanchard's words and actions do not fit this definition. To the contrary, he told the appellant in the most straightforward terms that all interrogation had to cease due to the request for legal representation.

■ The statements that Blanchard made after that disclaimer, objectively viewed, were not reasonably likely to elicit a response from the appellant; indeed, Blanchard explicitly told the appellant *not* to reply. A law enforcement officer's mere description of the evidence and of potential charges against a suspect, in direct response to the suspect's importuning, hardly can be classified as interrogatory. *See, e.g., United States v. Trimble*, 986 F.2d 394, 401 (10th Cir.1993); *United States v. Payne*, 954 F.2d 199, 203 (4th Cir.1992); *United States v. Jackson*, 863 F.2d 1168, 1172 (4th Cir.1989). Furthermore, as we read the record, the appellant's remarks during the course of Blanchard's narrative appear to have been spontaneous utterances, uncoerced by any vestige either of artifice or of official interrogation. *Edwards* does not bar the introduction into evidence of spontaneous utterances merely because the utterances occur subsequent to the accused's invocation of his right to counsel. *See, e.g., Shedelbower v. Estelle*, 885 F.2d 570, 573–74 (9th Cir.1989); *United States v. De La Luz Gallegos*, 738 F.2d 378, 381 (10th Cir.1984).

■ If more were needed—and we do not think that it is—no *Edwards* violation occurred regardless of how Blanchard's statements are characterized, inasmuch as the appellant himself prompted Blanchard's recitation of the facts and the potential charges. By repeatedly asking "what's this all about?" after he had requested a lawyer, the appellant expressed an insatiable desire to reignite the dialogue—and he persisted in his attempt to do so even after Blanchard reminded him of his right to an attorney. In such a situation, the suspect, having himself initiated the resumed discussion, cannot later be heard to claim that the officers, by doing his bidding, abridged his rights. *See Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983); *Trimble*, 986 F.2d at 401.

■ In a rather lame effort to avoid the force of these precedents, the appellant suggests that another event—the postal inspectors' discussion about searching Conley's abode—induced the appellant's questions and subsequent statements. This is nothing more than wishful thinking. A discussion between two law officers about the prospects for a search incident to an arrest is not so likely to elicit an incriminating response as to come within the *Innis* proscription.[3]

---

3. We note, moreover, that the prosecution did not introduce at trial the statements that Conley made at this juncture. Rather, the defense elicited them on cross-examination. Hence, the appellant has no basis to complain about the admission of this evidence. *See Miranda*, 384 U.S. at 444, 86 S.Ct. 1602.

We need not paint the lily. The record amply supports a finding that the appellant was not subjected to any interrogation after he invoked his right to counsel, and that he, not the postal inspectors, initiated the discussions which followed that request. That being so, the district court properly admitted the challenged statements into evidence. *See Shedelbower,* 885 F.2d at 573–74; *De La Luz Gallegos,* 738 F.2d at 381.

■ As a last gasp, the appellant argues that, even if there is no *Edwards* violation, there is a *Miranda* violation because Blanchard interrogated him before the postal inspectors administered the requisite warnings. To be specific, he asseverates that the question concerning the ownership of the money found in his wallet was asked in violation of *Miranda* and thus tainted all subsequent admissions. In this respect, the appellant relies on *Pope v. Zenon,* 69 F.3d 1018 (9th Cir.1995), in which the defendant, who had not yet received *Miranda* warnings, identified his signature, thus incriminating himself and opening the door to further queries regarding the crimes at issue. *See id.* at 1021.

The appellant's attempted analogy between the authorities' question regarding the cash found on his person during the arrest and the officers' inquiries about the signature in *Pope* is flawed. In *Pope,* the document bearing the accused's signature came from the scene of the crime and immediately implicated the writer. *See id.* at 1023. Here, however, no such implication attaches to Conley's ownership of the money (which turned out to be a non-issue at trial). Moreover, Blanchard's question in this case was much more of an informational inquiry incident to the arrest, as opposed to a query designed to induce an inculpatory remark.

■ To clinch matters, even if the appellant's affirmative response to the inspector's question about the cash amounted to self-incrimination, the mere fact that unwarned custodial questioning has occurred does not, by itself, taint all subsequent admissions. *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), stands squarely for the proposition that, although the accused's direct response to unwarned interrogation must be suppressed, the admissibility of any admission made after *Miranda* warnings are administered "should turn ... solely on whether [such statement] is knowingly and voluntarily made." *Id.* at 309, 105 S.Ct. 1285. We find no indication here that the appellant's answer to this single question, or the circumstances in which it was posed, had an impermissibly coercive effect. Indeed, the record reveals quite clearly that the appellant's subsequent statements about his involvement in the marijuana enterprise were entirely voluntary. Thus, this assignment of error falters. *See id.* at 314–16, 105 S.Ct. 1285.

## III. THE SENTENCE

■ The appellant protests two upward adjustments fashioned by the district court in shaping the GSR. We address the two adjustments separately, mindful that appellate tribunals review a sentencing court's factual determinations under a deferential standard and uphold those determinations unless they are clearly erroneous. *See United States v. St. Cyr,* 977 F.2d 698, 701 (1st Cir.1992). Questions of law, of course, engender plenary review. *See id.*

### A. *Drug Quantity.*

■ Under the sentencing guidelines, drug quantity bears a direct correlation to the GSR (and, therefore, to the length of a defendant's sentence). *See United States v. Sepulveda,* 15 F.3d 1161, 1196–97 (1st Cir. 1993). Here, Judge Woodlock credited statements made by the appellant's supplier, Womack, and included as part of the appellant's relevant conduct, USSG § 1B1.3 (1995), the quantities of marijuana contained in thirteen packages shipped by Womack at the appellant's express instruction (eight of which were mailed to the 5 Valley St. address). The judge then added the amounts of marijuana contained in two parcels that had been sent to Kubiak. On this basis, the judge held the appellant responsible for 91.3 kilograms of marijuana.

■ The appellant's greatest grievance with this computation is that it includes amounts of marijuana involved in counts on which the jury declined to convict. This

grievance is bootless. It is perfectly clear that a sentencing court can premise sentencing determinations on "acquitted conduct" so long as the court supportably finds, by a preponderance of the evidence, that the defendant committed the acts in question. *See United States v. Watts,* 519 U.S. 148, 117 S.Ct. 633, 637, 136 L.Ed.2d 554 (1997) (per curiam) (explaining that "[a]n acquittal is not a finding of fact" and therefore "does not preclude the government from relitigating the issue when it is presented in a subsequent action governed by a lower standard of proof") (citations and internal quotation marks omitted); *United States v. Berrios,* 132 F.3d 834, 839 (1st Cir.1998); *United States v. Meade,* 110 F.3d 190, 203 (1st Cir. 1997). That is precisely the situation that confronts us here.[4]

■ The appellant makes two related arguments, but neither of them need occupy us for long. First, he claims that he should not be brought to book for a number of the transactions because he was not the prime mover in this transcontinental marijuana-by-mail scheme and had no involvement in most of its iterations. This claim boils down to a credibility call, pure and simple. It is settled beyond cavil that, in the sentencing phase of a criminal case, credibility choices are within the exclusive province of the district judge. *See, e.g., Sepulveda,* 15 F.3d at 1198; *St. Cyr,* 977 F.2d at 706. Here, Judge Woodlock certainly did not exceed his authority in finding the appellant to be less believable than Taberski, Womack, and Wright, and concluding that the appellant bore responsibility for a broad array of misconduct.

■ The appellant's second point is no more convincing. The guidelines authorize inclusion in sentencing determinations of all "reasonably foreseeable acts and omissions of others in furtherance of jointly undertaken criminal activity." USSG § 1B1.3 (1995). Seizing on this language, the appellant questions whether the drug quantity tabulated by the sentencing court squares with this fore-

seeability requirement. This requirement exists, *see, e.g., United States v. Garcia,* 954 F.2d 12, 15 (1st Cir.1992), but it has no bearing here. A defendant simply cannot be heard to complain that he could not reasonably foresee acts that he himself engineered.

### B. *Role in the Offense.*

■ The sentencing guidelines direct the enhancement of a defendant's offense level by three levels if he serves as a manager or supervisor of a criminal enterprise that either numbers five or more participants (including the defendant) or is "otherwise extensive." USSG § 3B1.1(b) (1995). Apparently believing in the venerable adage that the best defense is a good offense, the appellant claims that the lower court erred not only in boosting his offense level under this guideline, but also in failing to decrease his offense level commensurate with his minor role in the conspiracy. *See* USSG § 3B1.2(b) (1995).

The appellant's arguments on this point are close to whimsical. We have declared, with a regularity bordering on the echolalic, that barring a mistake of law—and there is no hint of any such mistake here—"battles over a defendant's status ... will almost always be won or lost in the district court." *United States v. Graciani,* 61 F.3d 70, 75 (1st Cir.1995). Here, as in most such cases, the assessment of the appellant's role in the offense of conviction is factbound, and the facts solidly confirm Judge Woodlock's conclusion that the appellant supervised a scheme involving at least five participants. After all, the record supports serial findings that Conley supplied addresses to Wright and Womack, recruited Kubiak and Taberski as receivers for the falsely addressed packages, and supervised their efforts. No more is exigible for the three-level enhancement that the district court imposed.[5] *See, e.g., United States v. Joyce,* 70 F.3d 679, 683 (1st Cir. 1995); *United States v. Savoie,* 985 F.2d 612, 616 (1st Cir.1993). Moreover, because we

---

**4.** The judge's determination is particularly hard to fault as the judge had the benefit of Womack's version of the events during the sentencing phase—an advantage that the jury did not have.

**5.** The district court rejected the appellant's self-serving description of himself as a bit player, manipulated by Kubiak and Taberski. That finding was not clearly erroneous. *See Sepulveda,* 15 F.3d at 1198; *St. Cyr,* 977 F.2d at 706.

uphold the enhancement for Conley's managerial role, it follows inexorably that his participation in the offense of conviction was not "substantially less culpable than the average participant." USSG § 3B1.2, comment. (backg'd). Because an upward adjustment for a managerial role is fundamentally inconsistent with according the same individual, in respect to the same offense, a downward adjustment for a minor or minimal role, the district court did not err in failing to grant the appellant's motion for reduction.

## IV. CONCLUSION

We need go no further. The record reveals, without serious question, that the appellant was fairly tried and lawfully convicted, based in part on incriminating (but voluntary) statements that he made at the time of his arrest. He was then sentenced in full accord with the applicable guidelines.

*Affirmed.*