**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jody Myesha ORSO, Defendant–
Appellant.**

**No. 99–50328.**

United States Court of Appeals,
Ninth Circuit.

Argued April 7, 2000

Submitted Aug. 15, 2000

Filed Dec. 8, 2000

---

Emily S. Uhrig, Los Angeles, California, Elizabeth A. Newman, Deputy Federal Public Defender, Los Angeles, California, for the defendant-appellant.

Wendy O. Clendening, Office of the United States Attorney, Los Angeles, California, for the plaintiff-appellee.

Before: REINHARDT and O'SCANNLAIN, Circuit Judges, and

SCHWARZER, Senior District Judge.[1]

Opinion by Judge REINHARDT;
Partial Concurrence and Partial Dissent
by Judge O'SCANNLAIN

REINHARDT, Circuit Judge:

In this case, we must determine whether deceptive police tactics employed prior to the giving of a *Miranda* warning, for the purpose of convincing a suspect to waive her *Miranda* rights and make incriminating statements, requires suppression of the statements the suspect makes after she waives those rights. We vacated submission of this case pending the Supreme Court's resolution of *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). *Dickerson* confirmed the continued vitality of the constitutional rule that *Miranda* announced. *See id.* at 2333. We now conclude that before the appellant was advised of her *Miranda* rights the government deliberately employed improper tactics in order to secure incriminating statements and the taint of those tactics infected her subsequent confession. Therefore, her statements, both before and after she was advised of her *Miranda* rights, must be suppressed.

## FACTUAL BACKGROUND

While delivering mail, Vicki Orr, a United States postal letter carrier, was approached by the appellant, Jody Myesha Orso. Orso demanded that Orr produce her arrow keys, which are keys used to open United States Postal Service collection boxes and group mailboxes at apartment buildings. Orr gave Orso her keys and attempted to give her her mail satchel as well, but Orso refused the satchel. Orso then fled on foot.

Postal Service inspectors began an investigation. After United States Postal Inspectors Anthony Galetti and Shawn Tiller obtained information that made Orso a suspect, they left their cards at her

residence, requesting that she call them. In response, Orso contacted Tiller and spoke with him by telephone.

Shortly thereafter, a federal arrest warrant was issued for Orso for robbery of a United States postal letter carrier. More than two months later, Orso was arrested by Redondo Beach police officers on unrelated charges and taken to the Redondo Beach Police Department. The arresting officers then notified Galetti that they were holding Orso. Tiller and Galetti took Orso into their custody and transported her to the Postal Inspection Service Office in order to conduct a formal interview.

Orso was handcuffed (with her hands cuffed behind her back) and placed in the back seat of the vehicle for the length of the drive, which took 25–35 minutes. It is undisputed that Orso was in custody during that time, and that she was not informed of her *Miranda* rights at any time before or during the car ride. Galetti testified that neither he nor Tiller gave Orso a *Miranda* warning prior to discussing the crime with her because, "[w]e wanted to eventually speak with Miss Orso and thought that if we Mirandized her right away that she might not want to speak with us."

For the first 15 minutes of the drive, the inspectors and Orso engaged in conversation unrelated to the actual robbery. The officers did not explain whether this dialogue was intended to facilitate later interrogation concerning the robbery. About half-way through the ride, Galetti began to discuss the robbery with Orso. According to Galetti, he told Orso not to say anything. He testified that he only wanted to inform her of the facts and evidence implicating her in the robbery. Galetti admitted that he lied to Orso during this colloquy, telling her that a witness to the robbery thought that she might have seen a gun used, even though Galetti was fully aware that no such evidence ex-

1. The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

isted. Knowing that Orso would not be charged with armed robbery, Galetti nonetheless informed her that the maximum statutory penalty for armed robbery of a letter carrier was 25 years incarceration, at which Orso expressed surprise. Galetti then told her that he did not believe a gun was used, and that the statutory maximum penalty for unarmed robbery of a letter carrier was ten years, but that a more realistic sentence for unarmed robbery would be five years. Orso responded, saying, "Oh, I can do five years."

Notwithstanding Orso's response and Galetti's professed intention not to have Orso say anything before they arrived at the office, Galetti then informed Orso that the letter carrier had identified her as being the robber. In response to this statement, Orso said she "had never stood in a lineup before." Galetti continued, explaining that it was actually a picture of her that the letter carrier picked out. Galetti then told Orso that others involved in the robbery had essentially identified her. At that point, Orso allowed, "Well, if the letter carrier said it's me, then it must be me." Galetti also told Orso that an individual named Main was believed to be the driver of the car involved in the robbery. When Orso indicated that she did not know anybody by that name, Galetti began to describe Main's appearance, to which Orso replied, "Oh, the gold-toothed boy." Galetti testified that his statements "insinuated" that Orso should cooperate because others were already doing so.

Galetti testified that, after the series of exchanges described above, he requested that they stop speaking because he believed that Orso was on the verge of making incriminating statements. His dis-claimer does not change the fact that Orso had already made incriminating statements by the time the request was made. After making the incriminating statements, Orso asked if the inspectors would allow her to see her child before going to jail. Tiller, who accompanied Galetti, testified that he told her she "probably" could. (He also testified that, after she confessed at their office, the inspectors did in fact take her to see her child before transporting her to the detention center.)[2]

Soon after the inspectors arrived at the Postal Inspection Service Office with Orso, and only a little more than ten minutes after she made the incriminating statements, Galetti and Teller advised her of her *Miranda* rights, and she immediately waived them by signing a standard form. The inspectors then interviewed Orso for approximately one and a half hours, during which time she fully confessed to her involvement in the robbery.

A federal grand jury returned a one-count indictment charging Orso with unarmed robbery of a postal letter carrier in violation of 18 U.S.C. § 2114(a). Orso initially entered a plea of not guilty. She then moved to suppress both the statements she made in the car prior to receiving the *Miranda* warning and the post-warning statements she made at the station house. The district court held a hearing on the motion and, after taking evidence from Galetti, Orso, and Tiller, denied the motion with respect to both sets of statements. Orso subsequently changed her plea to a conditional guilty plea, and was sentenced to a term of 37 months in prison. She appeals the district court's order denying her motion to suppress.

---

2. While in the car, the officers had good reason to believe that the suspect they were dealing with was not mentally fit. Tiller testified that he found Orso's attitude during the car ride odd in that her positive attitude did not match what she was going through. However at no time did the inspectors inquire as to whether Orso took any medication or suffered from any psychological problems. Tiller's instincts regarding Orso's odd behavior were correct—evidence presented at sentencing showed that Orso had substantial psychological problems and a long history of family abuse, which made her easily susceptible to influence. Nevertheless, the inspectors secured incriminating statements from Orso before the ride ended.

## DISCUSSION

### A. Statements in the Car

■ Orso argues that the district court should have suppressed her statements made in the patrol car, because those statements were made prior to her being given a *Miranda* warning, and took place during a custodial interrogation. Statements obtained from a suspect through custodial interrogation prior to a *Miranda* warning are not admissible at trial (when offered for their truth), whether or not they are voluntarily made. *United States v. Moreno,* 891 F.2d 247, 249 (9th Cir. 1989).

■ The government concedes for purposes of this appeal that the inspectors committed a *Miranda* violation by their conduct in the patrol car. A *Miranda* violation occurs when a suspect is interrogated while in custody without first being advised of his rights. *See United States v. Gonzalez–Sandoval,* 894 F.2d 1043, 1046 (9th Cir.1990). Because Orso's *Miranda* rights were violated in the car, her statements to the inspectors while she was being transported to the Postal Inspection Service Office must be suppressed. *See Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■ Although the government concedes that the inspectors violated *Miranda,* it contends that Orso's statements were not actually incriminating. We disagree. Orso stated that if the letter carrier identified her, then "it must be me." Her other statements, while insufficient to constitute a confession, were certainly inculpatory as well. She stated that she knew someone who had been implicated in the crime, expressed surprise at the possibility of receiving a long sentence for the crime, and opined that she could serve a shorter sentence for it. Statements are

incriminating under *Miranda* as long as they "incriminate [the defendant] in any manner," because the privilege against self-incrimination "does not distinguish degrees of incrimination." *Miranda,* 384 U.S. at 476, 86 S.Ct. 1602. Therefore, we have no doubt that the statements in the car were incriminating.

### B. Statements Made at the Postal Inspection Service Office

■ After being taken to the Postal Inspection Service Office, Orso was advised of her *Miranda* rights. She waived these rights, was interviewed for about an hour and a half, and fully confessed her role in the crime. Orso does not claim that her confession was involuntary. Rather, she claims that it must be suppressed because it was tainted by her earlier admissions in the car.

■ In *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Supreme Court considered when *Miranda* requires the suppression of statements obtained after the suspect initially makes an incriminating statement, then receives a *Miranda* warning, and subsequently makes a further incriminating statement. The *Elstad* Court held that the further statement, obtained after the warning has been given, need only be suppressed when the first statement was given in response to "deliberately coercive or improper tactics" and the "coercive impact" of the first statement has not been dissipated by factors such as the passage of time, change in place, and change in identity of the interrogators. *Id.* at 310, 314, 105 S.Ct. 1285.[3]

In *Elstad,* the first statement made by the defendant was not involuntary or the result of deliberately improper tactics; it was obtained in the defendant's own house, in the absence of any restraint, while the defendant's mother waited in the kitchen.

---

**3.** If, on the other hand, the first statement does not have a coercive impact, the subsequent statement should be suppressed only if it was not voluntarily given. *See United States v. Wauneka,* 842 F.2d 1083, 1087 (9th Cir.

1988). Orso does not contend that her statement at the station was involuntarily given, except insofar as she claims that it was tainted by her statements made in the car.

*Id.* at 305–07, 105 S.Ct. 1285. Although the police in fact committed a *Miranda* violation by interrogating Elstad without first advising him of his rights, there is no evidence that they were aware that they should have administered a *Miranda* warning, because it was not clear to them that the brief conversation in Elstad's living room was custodial. *See id.* at 315, 105 S.Ct. 1285. In contradistinction to the case before us, the police in *Elstad* did not use deliberately improper tactics during the interrogation that produced the first incriminating statement. As the second statement was also given voluntarily, the *Elstad* Court held that, under the circumstances, its suppression was not required. *See id.* at 316, 318, 105 S.Ct. 1285.

The rule is different, however, when the police not only violate *Miranda* in obtaining the first set of incriminating statements, but use *deliberately improper* tactics while doing so. The second set of inculpatory statements is admissible only if the taint caused by the coercive impact of the deliberately improper tactics has been dissipated. *See Pope v. Zenon,* 69 F.3d 1018, 1024 (9th Cir.1995) (amended 1996); *United States v. Carter,* 884 F.2d 368, 373–74 (8th Cir.1989); *cf. United States v. Gale,* 952 F.2d 1412, 1418 (D.C.Cir.1992) (while some improper police conduct is not sufficient to cast doubt on later statement, a deliberate end-run on *Miranda* could suffice); *but see United States v. Esquilin,* 208 F.3d 315, 320–21 (1st Cir.2000) (refusing to suppress post-*Miranda* statements when pre-*Miranda* statement is voluntarily made, but is the result of deliberately improper tactics). Such statements are suppressed because "[a] contrary holding would only encourage police to resort to unacceptable tactics to circumvent *Miranda.*" *Pope,* 69 F.3d at 1024.

In *Pope,* we recognized that while initial questioning that deliberately employs improper tactics may not coerce a suspect into an immediate confession, such questioning may still have a coercive effect on subsequent statements. In that case, the detectives attempted to elicit "breakthrough" incriminating information from the suspect prior to advising him of his rights, in order to use that information as a "beachhead" to later undermine the effect of the *Miranda* warning and to compel the suspect to confess in spite of them. *Pope,* 69 F.3d at 1023. The detective received some incriminating information from the defendant, although not a full confession, prior to advising him of his *Miranda* rights, and thus "set him up to talk to them notwithstanding their advisement of rights." *Id.* In *Pope,* we noted that this tactic had been described in police manuals examined by the Supreme Court, and declared to be unlawful. *See id.; cf. California Attorneys for Criminal Justice v. Butts,* 195 F.3d 1039, 1042 (9th Cir.1999) (condemning the police practice of deliberately questioning suspects in violation of *Miranda*).

### 1. *Use of Improper Tactics*

Here, investigators used the very "beachhead" tactic condemned in *Pope:* they talked to Orso in isolation in the car without giving her *Miranda* warnings; falsely informed her about the "evidence" they had against her in order to make her fearful; and thereby elicited incriminating statements from her, including her admission that she knew one of the suspects. Orso's "breakthrough" statements served to incriminate her, and therefore established a "beachhead" from which to conduct the later full interrogation that led to her confession after the warning was given. Galetti's interrogation tactic was deliberate: he admitted that he employed it in order to get Orso to speak notwithstanding the *Miranda* warning that would follow. Furthermore, it worked. Orso gave a full confession after waiving her constitutional rights. As we explained in *Pope,* use of this tactic is "precisely what the Supreme Court had in mind" in *Elstad* when it exempted such conduct from the general rule that a post-*Miranda* state-

ment is admissible if it is voluntary. *Pope,* 69 F.3d at 1024.[4]

### 2. *Taint*

■ We must suppress Orso's confession at the Postal Inspection Service Office unless the taint caused by her prior statements resulting from the inspectors' deliberately improper tactics is sufficiently attenuated. *Elstad,* 470 U.S. at 310, 105 S.Ct. 1285. In our cases applying *Elstad,* when considering whether the taint has been dissipated, we have considered the following factors: the time between the two sets of statements, a change in environment or identity of interrogators, the purpose and flagrancy of the official misconduct, and other surrounding circumstances that may indicate a break in the chain of events arising from the original statement. *See United States v. Jenkins,* 938 F.2d 934, 941 (9th Cir.1991); *United States v. Patterson,* 812 F.2d 1188, 1192 (9th Cir.1987).

The record provides substantial evidence that the taint of the prior interrogation did not dissipate by the time Orso confessed at the station. The confession occurred approximately ten minutes after the colloquy in the car ended and did not involve a change in the identity of the interrogators. The memory of the prior incriminating statements was unquestionably still in Orso's mind. Moreover, the deliberate use of improper tactics and the deliberate failure to give Orso a *Miranda* warning prior to the initial interrogation had their intended effect. There was no break in the chain of events. Accordingly, we suppress the statement Orso made at the Postal Inspection Service Office.

---

**4.** *Pope* is fully consistent with our precedent establishing that, when determining whether a post-*Miranda* confession is voluntary, the use of deception does not necessarily render that confession involuntary. *See Amaya–Ruiz v. Stewart,* 121 F.3d 486, 495 (9th Cir.1997) (holding that a confession was not inadmissible simply because, *after* advising the suspect of his *Miranda* rights, the police misrepresen-

### CONCLUSION

Orso's statements made in the car and at the Postal Inspection Service Office must be suppressed. Orso was not advised of her rights before she made the first statements in response to deliberately improper police tactics, and the taint from the first interrogation had not dissipated before she waived her rights and made her post-*Miranda* confession. Accordingly, we vacate Orso's conditional plea, and remand for proceedings not inconsistent with this opinion.

### VACATED AND REMANDED.

O'SCANNLAIN, Circuit Judge, concurring in part and concurring in the result.

I join Part A. "Statements in the car" of the majority opinion. I write separately to explain why I concur in the result reached in Part B. "Statements Made at the Postal Inspection Service Office" of the opinion, even though its analysis is based on a flawed interpretation of Supreme Court precedent.

### I

The issue in Part B. is whether the statements Orso made in the office, after receiving the *Miranda* warnings, were admissible. The majority concluded that they were not. What the majority did not say, however, is that its opinion is based on a very controversial reading, and in my view an erroneous extension, of the Supreme Court's decision in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

In *Elstad,* the police elicited a confession from a suspect prior to giving him the

---

ted the evidence they had against him). The case before us poses a fundamentally different problem from the one at issue in *Amaya–Ruiz,* because in the present case, the deceptive tactics were employed in order to convince Orso to waive her *Miranda* rights, while in *Amaya–Ruiz,* the suspect had already been advised of his *Miranda* rights before the improper tactics were employed.

*Miranda* warnings, but then, after receiving the *Miranda* warnings, he confessed a second time. The question there, as here, was whether the second confession was inadmissible because it was the fruit of the tainted first confession. The court concluded that, even if the first confession were voluntary but elicited in violation of *Miranda,* then the second confession was admissible so long as it was voluntary as well. *See id.* at 314, 105 S.Ct. 1285 ("A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement."), 318, 105 S.Ct. 1285 ("[T]here is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary. The relevant inquiry is whether the second statement was voluntarily made."). By my reading of *Elstad,* the Court thus held that *only* if the first confession were *involuntary* must one decide "whether that coercion has carried over into the second confession" by considering "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators...." *Id.* at 310, 105 S.Ct. 1285.

The majority opinion takes a different view. It holds that a second confession can be excluded if the first confession is *either* involuntary *or* the result of deliberately improper police tactics. *See ante* at 440–41. Given the breadth and depth of case law on the question of voluntariness, the majority could hardly write an opinion that held that Orso's first confession was involuntary; exclusion could only be premised on the police's having used improper tactics.

Of course, the majority's interpretation is not entirely implausible. In addition to involuntariness, the Supreme Court refers to "coercion" and "improper tactics" throughout *Elstad. See, e.g., Elstad,* 470 U.S. at 309 ("It is an unwarranted exten-

sion of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual *coercion* or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." (emphasis added)), 314, 105 S.Ct. 1285 ("[A]bsent *deliberately coercive or improper tactics* in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." (emphasis added)). Thus, if one strained hard enough, one could perhaps read *Elstad* to create a new category of behavior called "improper tactics," separate and distinct from police conduct rendering confessions involuntary, which might trigger the fruit of the poisonous tree doctrine in the *Miranda* context.

Nonetheless, the better interpretation of *Elstad* is one that views the Supreme Court's references to "coercion" and "improper tactics" as examples of when police conduct could render the first confession involuntary. *See id.* at 317, 105 S.Ct. 1285 ("[N]or do we condone inherently coercive police tactics or methods offensive to due process *that render the initial admission involuntary* and undermine the suspect's will to invoke his rights once they are read to him." (emphasis added)), 317–18, 105 S.Ct. 1285 (disagreeing with a "handful of courts" that have "applied our precedents relating to confessions obtained under *coercive* circumstances to situations involving wholly *voluntary* admissions, requiring a passage of time or break in events before a second, fully warned statement can be deemed voluntary" (emphasis added)). As the First Circuit cogently concluded:

> This argument focuses on some admittedly imprecise language in *Elstad* while ignoring the Court's emphasis on voluntariness throughout the opinion. Although the Court did not explicitly define "deliberately coercive or improper tactics," it used several more detailed

phrases that in context are synonymous with that term: "actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will," *id.* at 309, 105 S.Ct. 1285; "physical violence or other deliberate means calculated to break the suspect's will," *id.* at 312, 105 S.Ct. 1285; and "inherently coercive police tactics or methods offensive to due process that render the initial admission involuntary and undermine the suspect's will to invoke his rights once they are read to him," *id.* at 317, 105 S.Ct. 1285. Contrary to Esquilin's argument that there are "improper tactics" that can raise a presumption of compulsion without regard to voluntariness, the *Elstad* Court held that "there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary." *Id.* at 318, 105 S.Ct. 1285. If we read *Elstad* as a coherent whole, it follows that "deliberately coercive or improper tactics" are not two distinct categories, as Esquilin would have it, but simply alternative descriptions of the type of police conduct that may render a suspect's initial, unwarned statement involuntary.

*United States v. Esquilin,* 208 F.3d 315, 320 (1st Cir.2000). In fairness to the majority, the language in *Elstad* is sufficiently "imprecise" to have apparently created a Circuit split on the question of whether "improper tactics" is a separately actionable category of behavior from involuntariness. *Compare Esquilin,* 208 F.3d at 320 *and U.S. v. Rith,* 164 F.3d 1323, 1333 (10th Cir.1999) ("The *Perdue* court expressly declined to apply *Elstad* because the defendant's first confession in *Perdue* was involuntary.... *Perdue* is relevant here only if Rith's pre-*Miranda* incriminating statements were involuntary; otherwise, *Elstad* applies and Rith may not avail himself of the fruit-of-the-poisonous-tree argument.") *with United States v. Carter,* 884 F.2d 368, 373 (8th Cir.1989) ("Assuming arguendo that the first, unwarned, confession was voluntary, we find that the circumstances of this case do not warrant admission of the second, warned, confession.").

## II

Despite the fact that I disagree with the majority's reading of *Elstad,* I concur in the result because a previous Ninth Circuit decision appears to have adopted the controversial reading of *Elstad* employed by the majority in this case. In *Pope v. Zenon,* 69 F.3d 1018 (9th Cir.1995), we held that "[t]he conduct of the police in this case is precisely what the Supreme Court had in mind in [*Elstad*] when it exempted 'deliberately coercive or improper tactics in obtaining the initial statement' from the ordinary rule that subsequent statements are not to be measured by a 'tainted fruit' standard, but by whether they are voluntary."[1] *Id.* at 1024. The pre-*Miranda* warning conduct by the police in *Pope* was nothing more than truthfully advising the defendant of the evidence against him. If that is sufficient to amount to "coercive" tactics under *Elstad,* then, *a fortiori,* the tactics in this case, which consisted of lying to the defendant about the evidence

---

1. It should be noted that the facts of *Pope* are somewhat different from the facts of this case and the facts of *Elstad.* In *Elstad* and in this case, the police improperly asked questions of a defendant prior to reading the *Miranda* warnings, and these questions led to incriminating statements by the witness prior to those warnings. By contrast, in *Pope,* the police improperly asked questions of a defendant prior to reading the warnings, but the witness did not say anything until after the warnings had been read. *See Pope,* 69 F.3d at 1021–22. The threshold question in *Pope,* which was glossed over by that panel, is how the *Elstad* rule, which makes the admissibility of post-*Miranda* warning statements dependent upon the voluntariness of pre-*Miranda* warning statements, operates in a context where there are no pre-warning statements at all. The only application of *Elstad* in such a context that makes any sense is one that would make the post-*Miranda* warning statements inadmissible if the pre-*Miranda* police tactics *would have* rendered any pre-*Miranda* warning statements involuntary, *had* such pre-warning statements been made.

against her, are sufficient as well. Accordingly, Orso's statements in the police station are inadmissible.

While I specially concur in the result as to Part B., I continue to have misgivings that our reading of *Elstad* is sound.