USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1312

 TAM S. BUI,
 Petitioner, Appellant,

 v.

 PAUL DIPAOLO, ET AL.,
 Respondents, Appellees.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. William G. Young, U.S. District Judge]

 Before

 Selya, Circuit Judge,
 
 Cyr, Senior Circuit Judge,
 
 and Stahl, Circuit Judge.
 

 Wendy Sibbison, with whom Harris Freeman was on brief, for
appellant.
 Charles W. Rankin and Rankin & Sultan on brief for Criminal
Justice Act Board for the District of Massachusetts (with whom the
Federal Defender Office for the Districts of Massachusetts and New
Hampshire joins), amici curiae.
 Cathryn A. Neaves, Assistant Attorney General, Commonwealth of
Massachusetts, with whom Scott Harshbarger, Attorney General, was
on brief, for appellees.
 

March 15, 1999

 
 SELYA, Circuit Judge. This habeas case presents both
procedural and substantive quandaries. Procedurally, we must
determine the effect of a district court's grant of a certificate
of appealability on some, but not all, of the issues that a habeas
petitioner seeks to pursue. Substantively, we must determine
whether the petitioner has shown legal cause for us to set aside
his state court convictions.
I. BACKGROUND
 In November 1989, police discovered the stabbed bodies of
a mother and daughter, Ngoc Le and Dixie Poulin. Evidence at the
crime scene (the victims' apartment) suggested that Dixie also had
been bludgeoned with a blunt instrument, probably a gun, and that
the perpetrator(s) likely had absconded with jewelry and cash. 
Several months later, Thinh Trinh, an acquaintance of the victims,
informed the authorities that the petitioner, Tam Bui, had boasted
of wielding a gun at the apartment around the time of the murders. 
Thinh's wife, Linh Nguyen, substantiated the story, recalling that
the petitioner told her that he had participated in the crime. As
additional corroboration, Thinh and Linh produced two pieces of
jewelry that they claimed the petitioner had given to Linh. The
jewelry appeared to have belonged to Ngoc Le.
 In due course, the police obtained warrants for the
petitioner and two other suspects. They first sought to find Bui
at his parents' flat. He was not there, but police seized a .38
caliber handgun that Bui's father stated belonged to his son. 
Shortly thereafter, the authorities apprehended the petitioner and
charged him (and the other suspects).
 At trial in a Massachusetts state court, the
Commonwealth's most incriminating evidence consisted of (i) certain
statements that the petitioner had made to police after his arrest,
(ii) the testimony of Thinh and Linh, and (iii) the handgun (which
the Commonwealth hypothesized had been used to bludgeon Dixie
Poulin). The jury convicted the petitioner on two counts of first-
degree murder and one count of armed robbery. The court sentenced
him to serve two consecutive terms of life imprisonment.
 The Massachusetts Supreme Judicial Court (SJC) affirmed
the convictions. See Commonwealth v. Bui, 419 Mass. 392, 645
N.E.2d 689 (1995) (Bui I). The petitioner then sought habeas
corpus relief in the federal district court, see 28 U.S.C. 2254,
naming as respondents two state officials. His petition enumerated
several purported constitutional faults. The district court found
the claims of error unpersuasive and declined to disturb the state
court judgment. See Bui v. DiPaolo, 985 F. Supp. 219 (D. Mass.
1997) (Bui II).
 Because Bui filed his application for habeas corpus
relief in December 1996, the Antiterrorism and Effective Death
Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, 1217-18
(Apr. 24, 1996) (codified in scattered sections of 28 U.S.C.),
governs this case. See Lindh v. Murphy, 117 S. Ct. 2059, 2068
(1997) (holding that, in general, AEDPA's provisions apply to cases
filed after its effective date). Under the AEDPA amendments, a
habeas petitioner can prosecute an appeal only if he first obtains
a certificate of appealability (COA). See 28 U.S.C. 2253(c). In
this instance the district court, after denying the application for
a writ of habeas corpus, certified one issue for appeal the
petitioner's Sixth Amendment claim that the trial court
impermissibly thwarted his lawyer's attempts to cross-examine Thinh
 but declined to certify the petitioner's Fifth Amendment claim.
 Undaunted, the petitioner sought to proceed in this venue
on both claims. Because we had not had occasion to resolve the
question of whether COAs are to be treated as case-specific or
issue-specific, we permitted the petitioner to brief his Fifth
Amendment claim on the merits, but required that he simultaneously
brief the antecedent procedural question. Consequently, we begin
by erecting a procedural framework for the handling of COAs in
multi-issue cases. We then discuss the petitioner's two
substantive contentions.
II. CERTIFICATES OF APPEALABILITY
 Bui and the amici argue that we are obligated to mull the
merits of his Fifth Amendment claim because, in their view, COAs
issued under the AEDPA-spawned habeas amendments should be treated
as case-specific rather than issue-specific. In other words, they
contend that the grant of a COA on any one issue opens all issues
in the case to full appellate review. Although this result would
have been consistent with practice as it existed before the AEDPA
amendments, see Magouirk v. Phillips, 144 F.3d 348, 356 (5th Cir.
1998); Tejeda v. Dubois, 142 F.3d 18, 22 n.4 (1st Cir. 1998), we
think it is now outmoded. Congress, in enacting the AEDPA, meant
to change prior practice and succeeded in doing so: the language
and structure of the amended habeas statute pretermit appellate
consideration of claims not properly certified for appeal.
 The AEDPA predicates the very issuance of a COA without
which "an appeal may not be taken to the court of appeals," 28
U.S.C. 2253(c)(1) on whether an "applicant has made a
substantial showing of the denial of a constitutional right." Id.at 2253(c)(2). A habeas petitioner who fails to demonstrate that
his claims satisfy the substantial showing standard may not appeal
the denial of habeas corpus at all.
 This rule is easily applied in situations in which a
habeas court's decisions on the merits and on the availability of
a COA are congruent. Thus, if a habeas application raises only
issues that, in the district court's opinion, warrant neither
relief nor a COA, no appeal lies. Conversely, if the application
raises only issues that, according to the district court, uniformly
pass muster under the substantial showing standard and, thus, are
certifiable (even though in the district court's view they do not
justify relief), then a free-ranging appeal lies.
 In these examples, the COA itself is but a variable that
depends wholly on the existence of a substantial showing that the
petitioner's constitutional rights have been abridged. The
question at hand is whether this relationship is altered in a
situation that lacks essential congruence, that is, when the
district court, having denied a habeas application, deems some, but
fewer than all, of the petitioner's claims certifiable.
 We believe that the necessity for a substantial showing
extends independently to each and every issue raised by a habeas
petitioner. Had the mere existence of a COA been sufficient to
qualify all the issues in a habeas case for appellate review, it
would have been pointless for Congress to go on to state, in
section 2253(c)(3), that a COA "shall indicate which specific issue
or issues satisfy" the substantial showing standard of section
2253(c)(2). This language was absent from section 2253's previous
incarnation, and the fact that Congress added it in the AEDPA
signals an intent that the courts should accord some significance
to it. The petitioner's reading of the statute would render this
phrase superfluous, for as long as one issue were certifiable, all
others would be amenable to review. We customarily read statutes
in a manner that gives effect to all words and phrases, see Waltersv. Metropolitan Educ. Enters., Inc., 117 S. Ct. 660, 664 (1997);
United States v. Ven-Fuel, Inc., 758 F.2d 741, 751-52 (1st Cir.
1985), and we see no valid reason to deviate from this salutary
practice here.
 Common sense also suggests that such an interpretation
should be preferred. Were we to adopt the petitioner's
construction of the statute, we would establish a paradigm under
which tenuous habeas claims could not be appealed if asserted on
their own, but could command appellate attention if accompanied by
a solitary claim that met the substantial showing standard. This
dichotomy lacks rhyme or reason, and there is no indication that
Congress intended to create so curious a structure. The better
reading of the habeas amendments is one that links section
2253(c)(3)'s insistence on an issue by issue enumeration of what
has been certified for appeal with the substantial showing
requirement of section 2253(c)(2). We hold, therefore, that a
court of appeals should not consider the merits of an issue
advanced by a habeas petitioner unless a COA first has been
obtained with respect to that issue. Accord Ramsey v. Bowersox,
149 F.3d 749, 759 (8th Cir. 1998), cert. denied, 1999 WL 16676
(U.S. Feb. 22, 1999) (No. 98-7613); Murray v. United States, 145
F.3d 1249, 1250-51 (11th Cir. 1998); Sylvester v. Hanks, 140 F.3d
713, 715 (7th Cir. 1998); Lackey v. Johnson, 116 F.3d 149, 151 (5th
Cir. 1997); In re Certificates of Appealability, 106 F.3d 1306,
1308 (6th Cir. 1997).
 Were the power to issue a COA exclusively a prerogative
of the district courts, this holding might answer the procedural
question that confronts us. Under the AEDPA amendments, however,
a habeas petitioner who fails in his effort to obtain a COA in the
district court may then beseech the court of appeals to issue one. 
See Fed. R. App. P. 22(b)(1) ("If the district judge has denied the
certificate, the applicant for the writ may then request issuance
of the certificate by a circuit judge."). The procedure for cases
in which the district court does not grant a COA at all is
uncontroversial: even if there is no express request for a COA,
the court of appeals must deem a notice of appeal to represent a
request for a COA on all issues raised. See Fed. R. App. P.
22(b)(1)-(2). The rules are silent, however, with respect to the
appropriate procedure in hybrid cases. Thus, we must decide what
course a habeas petitioner should follow when the district court
certifies some, but not all, of the issues that he wishes to vent
on appeal.
 If the district court issues a limited COA (i.e., a COA
that permits the petitioner to go forward on fewer than all of the
issues raised in his petition), the petitioner must present
promptly to the court of appeals an express request for a
complementary COA. Although this court's local rules do not
definitively resolve the timing issue, it is our present practice
to notify each habeas petitioner of an outside date by which his
request for a COA must be filed in the court of appeals. Failure
to file within that interval may be deemed to constitute a waiver.
 The request for a complementary COA must be explicit as
to the issues which the petitioner wishes us to consider and, in
such circumstances, we will not treat an inexplicit notice of
appeal, without more, as an invitation to review the district
court's denial of certification with regard to the petitioner's
remaining claims. In taking this stance, we adopt the rule stated
in United States v. Kimler, 150 F.3d 429, 430 (5th Cir. 1998)
(declaring that a notice of appeal in a multi-issue habeas case
will not be treated as a constructive request for expanding a
limited COA issued by the district court), and reject the rule
stated in Kincade v. Sparkman, 117 F.3d 949, 953 (6th Cir. 1997)
(treating a notice of appeal in a hybrid case as "an informal
request with this Court to review the district Court's denial as to
[the petitioner's] remaining claims"). We make one related point: 
the request for a complementary COA, whether contained in a
separate document or incorporated into the notice of appeal, should
be accompanied by a copy of the district court's order and a
memorandum giving specific and substantial reasons (not mere
generalizations) why a certificate should be granted.
 In the interests of fairness and judicial economy, we
also rule that, when the district court grants a limited COA and
the petitioner seasonably seeks to expand it, his appeal on the
certified issue(s) should be held in abeyance, and full briefing
deferred, until this court determines the appealability of the
issues that the district court deemed unworthy of appellate
scrutiny (and, thus, whether we will issue a complementary COA). 
Accord Kimler, 150 F.3d at 431 n.1; Kincade, 117 F.3d at 953;
United States v. Simmonds, 111 F.3d 737, 740-41 (10th Cir. 1997). 
As an administrative measure, we advise litigants that, to the
extent practicable, the panel that determines whether to issue a
complementary COA also will be the panel that adjudicates the
appeal on the merits.
 We are aware that a few cases are pending in which, as
here, a motions judge has adopted an ad hoc framework for handling
situations in which a district court, over a habeas petitioner's
objection, issued a limited COA. Such actions were entirely
appropriate in the absence of a definitive resolution of the
attendant procedural questions. We will, of course, allow those
appeals to proceed in the ordinary course, under the terms of the
provisional orders previously entered. In future cases, however,
we will require habeas petitioners to walk the procedural path that
we set in place today. We regard the instant case as
grandfathered.
III. THE FIFTH AMENDMENT CLAIM
 When the district court issued a COA restricted to the
Sixth Amendment issue, the petitioner's able counsel timely filed
a notice of appeal and contemporaneously submitted an application
to the district court to enlarge the COA to encompass the Fifth
Amendment claim. When no amended certificate emerged, counsel
sought a complementary COA in this court. We entered an order,
previously described, directing the petitioner, inter alia, to
brief his Fifth Amendment claim on the merits. Reading the new
habeas amendments literally, we next should consider whether the
petitioner has made a "substantial showing of the denial of a
constitutional right" in respect to this Fifth Amendment point. 28
U.S.C. 2253(c)(2). Here, however, under the terms of our interim
order, the parties have fully briefed and argued the merits of that
claim. Since we decline to take two steps where one will do, we
skip the preliminary "substantial showing" inquiry and turn
directly to the merits. We caution, however, that this expedient
departs from the norm, and we employ it here solely because of the
terms of the interim order.
 The petitioner's Fifth Amendment claim has its genesis in
a 30-minute conversation between him and the police conducted
shortly after his arrest. The facts surrounding the interview,
derived primarily from a police report, are not in dispute. When
the authorities arrested the petitioner on August 18, 1990, they
gave him Miranda warnings in his native language (Vietnamese). The
petitioner acknowledged that he understood his rights.
 Before interviewing the petitioner, the police again
advised him of his rights, this time in both English and
Vietnamese. In response, the petitioner proclaimed that he knew
his rights, that "my Constitution will protect me," and that "you
have nothing." When an officer asked if he had anything to say
about why he was being arrested, the petitioner replied in the
negative. Then before the officer posed another question he
inquired: "Who said I did this?" The petitioner thereafter
answered some questions, while brushing others aside. The
interview ended when he declined to respond to a query asking what
he had "to say about what happened around [the time of the
murders]."
 After the state trial court had refused to suppress the
interview, a number of the petitioner's statements were admitted
into evidence. For example, the Commonwealth introduced the
petitioner's comment about the gun that had been found in his
parents' abode and his remark to the police that "you have
nothing." On direct appeal, the SJC upheld the admissibility of
these statements. See Bui I, 419 Mass. at 396-97, 645 N.E.2d at
692-93. In considering the petitioner's ensuing habeas
application, the district court found no unequivocal assertion of
the right to remain silent and dismissed the Fifth Amendment claim
on the authority of Davis v. United States, 512 U.S. 452 (1994). 
See Bui II, 985 F. Supp. at 226-28.
 Seizing on the fact that Davis involved only the right to
counsel in Davis, 512 U.S. at 458-59, the Court held that if an
accused wishes to assert a right to counsel, he must so state
unambiguously the petitioner posits that Davis is inapplicable
where, as here, a defendant anchors a Fifth Amendment claim upon
the right to remain silent. This means, he says, that we must
grant habeas relief because Davis does not comprise "clearly
established Federal law, as determined by the Supreme Court of the
United States," within the purview of 28 U.S.C. 2254(d)(1).
 The petitioner's attempt to characterize Davis as
something other than "clearly established Federal law" rests on a
mistaken premise: the idea that, merely because Davis does not
directly compel the particular outcome reached by the state court,
a federal habeas court perforce must issue the writ. This is a non
sequitur. Under the AEDPA amendments, federal courts review state
court judgments to determine whether those judgments construe or
apply federal law in a manner that is "contrary to" or an
"unreasonable application of" the Supreme Court's "clearly
established" jurisprudence. See O'Brien v. Dubois, 145 F.3d 16, 24
(1st Cir. 1998) (citing statutory language). The question, then,
is whether the Massachusetts courts' rulings in this case
contravene the Court's precedents or represent an unreasonable
application of them.
 If Davis is the relevant precedent, we do not see how we
can disturb the judgment. To be sure, Davis concerned only the
right to counsel recognized in Miranda v. Arizona, 384 U.S. 486
(1966). Nonetheless, every circuit that has addressed the issue
squarely has concluded that Davis applies to both components of
Miranda: the right to counsel and the right to remain silent. SeeUnited States v. Mills, 122 F.3d 346, 350-51 (7th Cir.) (citing
United States v. Banks, 78 F.3d 1190, 1196-97 (7th Cir. 1996)),
cert. denied, 118 S. Ct. 637 (1997); Medina v. Singletary, 59 F.3d
1095, 1100-01 (11th Cir. 1995); United States v. Johnson, 56 F.3d
947, 955 (8th Cir. 1995). For the purposes of habeas corpus
review, we simply cannot deem unreasonable a conclusion by the
Massachusetts courts that is consistent with the approach taken by
so many respected tribunals.
 In an effort to avoid the force of this reasoning, the
petitioner maintains that Davis is inapposite to Miranda's right to
remain silent. Although the similarity of the analyses requisite
for assessing claims anent Miranda's right to counsel and its right
to remain silent suggests that Davis constitutes strong evidence of
how the Supreme Court likely would decide this right to remain
silent question, we acknowledge that Davis does not
"authoritatively" answer the question in the narrow, technical
sense of that term. We therefore assume for argument's sake that
Davis is not the relevant precedent. Even on this assumption, the
petitioner's challenge to the state court judgment fares poorly.
 As the petitioner sees it, his claim implicates a line of
authority which states that, as long as a criminal defendant
articulates his Fifth Amendment rights in even an equivocal manner,
police interrogation must cease immediately. See Michigan v.
Mosley, 423 U.S. 96, 103-04 (1975); Quinn v. United States, 349
U.S. 155, 162-64 (1955); United States v. Barone, 968 F.2d 1378,
1384 (1st Cir. 1992); see also Wayne R. LaFave & Jerold H. Israel,
1 Criminal Procedure 6.9(e), 531-33 (1984 & Supp. 1991)
(discussing implied assertion of Miranda rights). Under this legal
rubric, the petitioner argues, his statement to the effect that "my
Constitution will protect me" and his negative response to the
officer's query anent whether "he had anything to say about what he
was being arrested for" were, at the very least, equivocal
assertions of the right to remain silent, and, therefore, precluded
the police from doing more than following up with clarifying
questions. See United States v. March, 999 F.2d 456, 461 (10th
Cir. 1993) (collecting cases). Since the police went further, the
petitioner reasons, the trial court should have suppressed all the
statements.
 Setting to one side the question of whether the doctrinal
underpinnings of the petitioner's argument retain much integrity
after Davis, we believe that the facts of this case are controlled
by a different line of authority. In North Carolina v. Butler, 441
U.S. 369, 373 (1979), the Court made it pellucid that an express
statement is not invariably necessary to support a finding that the
defendant waived either the right to remain silent or the right to
counsel. We, too, have employed this implied waiver doctrine, see 
United States v. Garcia, 983 F.2d 1160, 1169 (1st Cir. 1993), and
it appears to be the primary ground on which the SJC resolved the
petitioner's Fifth Amendment claim, see Bui I, 419 Mass. at 397,
645 N.E.2d at 692-93. 
 Precisely when waiver may be implied depends on the
circumstances. Even so, there are certain types of cases in which
courts routinely conclude that a defendant who has professed an
understanding of his right to remain silent has waived that right. 
For example, a defendant will be held to have effected a waiver
when, after receiving warnings and asserting (equivocally or
unequivocally) a right to remain silent, he spontaneously
recommences the dialogue with his interviewers. See Edwards v.
Arizona, 451 U.S. 477, 484-85 (1981); United States v. Conley, 156
F.3d 78, 83 (1st Cir. 1998). So, too, if a defendant's
incriminating statements were made either as part of a "steady
stream" of speech, Bradley v. Meachum, 918 F.2d 338, 342 (2d Cir.
1990), or as part of a back-and-forth conversation with the police,
Baskin v. Clark, 956 F.2d 142, 146 (7th Cir. 1992), courts
regularly have found waivers. A waiver of Miranda rights also may
be implied when, after having received Miranda warnings, a criminal
defendant responds selectively to questions posed to him. SeeUnited States v. Soliz, 129 F.3d 499, 503 (9th Cir. 1998); United
States v. Eaton, 890 F.2d 511, 513-14 (1st Cir. 1989) (Breyer, J.);
United States v. Chong, 829 F.2d 1572, 1574 (11th Cir. 1987).
 The petitioner's interview displays characteristics that
fit the implied waiver profile. In his initial statements, uttered
immediately after the second round of Miranda warnings, the
petitioner proclaimed that he knew his rights and that the
Constitution would protect him. The petitioner's claim to the
contrary notwithstanding, these comments cannot plausibly be
construed to suggest that the speaker intended to assert Mirandarights. In all events, the spontaneous utterance "you have
nothing," made immediately after those comments and without any
semblance of police provocation, is not protected by the Fifth
Amendment. See Conley, 156 F.3d at 83; Baskin, 956 F.2d at 146. 
Up to this point, the dialogue has the distinct flavor of a back-
and-forth conversation between the petitioner and his interviewer. 
See, e.g., Baskin, 956 F.2d at 146.
 An examination of the remainder of the interview lends
credence to this impression. Once the petitioner boasted that the
police had nothing, the interviewer legitimately followed up by
asking him whether he had something to say about the reasons for
his arrest. The petitioner answered "no" and this is a point at
which he now avers the police should have stopped their
questioning. He might have had a stronger argument had he not
added anything to his response, see Conley, 156 F.3d at 83, but he
then immediately asked the police: "who said I did this?" The
petitioner's continuation of the conversation by means of this
question both negated any effect his prior response may have had as
an assertion of his right to remain silent and confirmed that the
interview was indeed a back-and-forth exchange. See Baskin, 956
F.2d at 146.
 To say more on this point would be supererogatory. The
short of it is that the petitioner did not unequivocally assert his
right to remain silent, and, moreover, selectively responded to
questions during what otherwise appears to have been a fairly
standard two-way conversation with the authorities. The
prosecution thereupon introduced those responses at trial. If the
relevant precedent here is Davis, the petitioner cannot prevail
because he made no clear articulation of a desire to stand mute. 
If, however, Davis does not apply, the relevant precedent is
Butler, and federal courts have on numerous occasions employed its
implied waiver principle to uphold the admissibility of evidence
under circumstances similar to those presented in this case. See,
e.g., Ramirez, 79 F.3d at 305; Baskin, 956 F.2d at 146; Bradley,
918 F.2d at 342; see generally LaFave & Israel, supra 6.9(d), at
530-31 (discussing implied waivers). Either way, the SJC's
application of federal law (and, for that matter, the state trial
court's determination of subsidiary facts) does not fall outside
the sphere of acceptability. See O'Brien, 145 F.3d at 25.
IV. THE SIXTH AMENDMENT CLAIM
 We pause to set the petitioner's Sixth Amendment claim
into perspective. Thinh was one of two persons who testified that
the petitioner admitted involvement in the murders, and one of
three who described him brandishing a knife and suggesting that he
had used it to commit a crime. In addition, Thinh recounted
important information concerning the petitioner's possession of
certain items of jewelry ostensibly belonging to Ngoc Le. See Bui
I, 419 Mass. at 398-99, 645 N.E.2d at 693 (summarizing Thinh's
testimony).
 The petitioner had hoped to impeach Thinh's credibility
by developing, inter alia, a rather intricate theory of bias. In
the petitioner's scenario, Thinh and Linh were coerced into
testifying falsely by Linh's father, Mong Nguyen, a drug kingpin,
who took this action because the petitioner had refused, in the
presence of Mong's peers (equally notorious drug lords), to
transport drugs. According to the petitioner, extreme retributive
tendencies characterize interpersonal relations in Vietnamese
society, and Thinh's rejection so affronted Mong that he exacted
revenge by directing his daughter and quondam son-in-law to frame
Bui.
 At trial, the petitioner's counsel first attempted to
gather support for this hypothesis by questioning Linh on voir
dire, outside the jury's presence. He drew a blank. He revisited
the subject with Thinh, but the trial judge sustained the
prosecution's objections to his initial round of questions. 
Counsel thereupon made an offer of proof. The judge remained
steadfast and refused, on relevancy grounds, to allow the attorney
to ask the proposed questions. After the jury convicted the
petitioner, the SJC affirmed this evidentiary ruling, finding the
petitioner's theory of bias too speculative to justify cross-
examination. See id. at 401, 645 N.E.2d at 694-95.
 The Confrontation Clause places a high value on the right
to cross-examination. See Delaware v. van Arsdall, 475 U.S. 673,
678-79 (1986). That right is witness-specific. See id. at 680. 
Furthermore, a criminal defendant's entitlement to cross-examine a
witness increases in sensitivity in direct proportion to the
witness's importance to the prosecution's case. See United Statesv. Mizell, 88 F.3d 288, 292-93 (5th Cir. 1996); United States v.
Taylor, 17 F.3d 333, 340 (11th Cir. 1994); see also United Statesv. Tracey, 675 F.2d 433, 437-38 (1st Cir. 1982) (collecting cases). 
Given Thinh's status as a key figure in the prosecution's case, it
is readily apparent that the petitioner's claim demands close
attention.
 The petitioner exhorts us to hold that the Massachusetts
courts violated his rights under the Confrontation Clause by
prohibiting all inquiry into a cogent bias theory. Citing cases
such as United States v. Lynn, 856 F.2d 430, 433 (1st Cir. 1988),
he maintains that the trial court's actions violated the general
rule requiring courts to permit a threshold level of cross-
examination on bias and, thus, the SJC's holding was "contrary to"
clearly established Supreme Court precedent. We reject this
plaint.
 Speaking in the large, the jurisprudence of the
Confrontation Clause rarely lends itself to Procrustean
application, see O'Brien, 145 F.3d at 26, and the case law simply
does not state the "threshold level of inquiry" rule in terms as
absolute as the petitioner would have it. Indeed, the van ArsdallCourt explicitly recognized that, under certain circumstances,
trial judges possess broad discretion to limit cross-examination. 
See van Arsdall, 475 U.S. at 679 (enumerating various factors that
may justify circumscription of cross-examination). Thus, to the
extent that the petitioner is suggesting that a criminal defendant
has license to cross-question a prosecution witness concerning
every conceivable theory of bias, regardless of the prevailing
circumstances, he is plainly wrong. The threshold requirement
imposed by the Confrontation Clause is satisfied as long as the
defendant is given a fair chance to inquire into a witness's bias. 
See United States v. Sinclair, 109 F.3d 1527, 1537 (10th Cir.
1997); United States v. Guthrie, 931 F.2d 564, 568-69 (9th Cir.
1991); United States v. Boylan, 898 F.2d 230, 254-55 (1st Cir.
1990). A criminal defendant is not regarded as being deprived of
that chance if a trial court legitimately determines that his
cross-examination is inappropriate. See van Arsdall, 475 U.S. at
679.
 With these principles in mind, we cannot say that the
Massachusetts courts acted contrary to established Supreme Court
case law in regard to this matter. The petitioner cross-examined
Thinh at length with respect to bias, and the trial court based its
restriction of further cross-examination on relevancy grounds 
something van Arsdall, in principle, expressly permits. Thus, we
must test the propriety of the Massachusetts courts' conclusions by
asking whether forbidding further cross-questioning represented an
unreasonable application of the Supreme Court's Confrontation
Clause precedents. See 28 U.S.C. 2254(d)(1). In itself, this
is not a surprising development: when a constitutional claim
requires balancing rather than applying a strict, one-dimensional
legal rule, that ordinarily is an indication that a habeas court,
in the end, will have to gauge the reasonableness of the state
court's application of the rule. See, e.g., Holman v. Gilmore, 126
F.3d 876, 881-82 (7th Cir. 1997) (stating that "when the
constitutional question is a matter of degree, rather than of
concrete entitlements, a 'reasonable' decision by the state court
must be honored"), cert. denied, 118 S. Ct. 1169 (1998).
 Before turning to specifics, we reiterate the narrow
circumference of appellate review in connection with the
"reasonable application" standard. Under this formulation, a
federal court may not "grant the writ merely because it disagrees
with the state court's decision, or because, left to its own
devices, it would have reached a different result." O'Brien, 145
F.3d at 25; accord Corwin v. Johnson, 150 F.3d 467, 471-72 (5th
Cir.), cert. denied, 119 S. Ct. 613 (1998); Neelley v. Nagle, 138
F.3d 917, 924 (11th Cir. 1998), cert. denied, 119 S. Ct. 811
(1999); Hennon v. Cooper, 109 F.3d 330, 334-35 (7th Cir.), cert.denied, 118 S. Ct. 72 (1997). The question, rather, is whether the
state court has applied federal law in a manner that is "so
offensive to existing precedent" or so lacking in foundation that
its conclusion is "outside the universe of plausible, credible
outcomes." O'Brien, 145 F.3d at 25. As suggested by our
discussion of the Fifth Amendment claim, what this standard implies
is that we cannot deem a state court's application of federal law
unreasonable when federal courts typically, the circuit courts of
appeals regularly resolve cases in a similar fashion. SeeWilliams v. Taylor, 163 F.3d 860, 869 (4th Cir. 1998); Davis v.
Johnson, 158 F.3d 806, 813-14 (5th Cir. 1998), petition for cert.
filed (U.S. Feb. 23, 1999) (No. 98-8209); O'Brien, 145 F.3d at 25;
cf. Lambrix v. Singletary, 117 S. Ct. 1517, 1530 (1997) (engaging
in a similar analysis in a pre-AEDPA habeas proceeding).
 Another dimension of the problem deserves mention. In
order for a federal court to conclude that a state court has
applied federal law reasonably, it is not necessary that the
federal court agree with every last detail of the state court's
analysis. By like token, state courts are not required to supply
the specific reasons that a federal court thinks are most
persuasive for upholding the judgment. Rather, it suffices that
the state court generally articulates and applies tenets that can
reasonably sustain its judgment. Thus, the question on habeas
corpus review is whether the state courts' invocation and reliance
on enunciated legal principles are reasonably consistent with the
facts, circumstances, and outcome of the case. See, e.g., Hennon,
109 F.3d at 335 ("It doesn't follow that the criterion of a
reasonable determination is whether it is well reasoned. It is
not. It is whether the determination is at least minimally
consistent with the facts and circumstances of the case."). Were
we to insist on perfect jurisprudential harmony, not only would we
risk defying Congress's will by transforming the AEDPA standard
into one of plenary review, but we also would place ourselves in a
position in which we might invalidate convictions not because a
"defendant may have been the victim [] of [a] constitutional error
but merely of a failure of judicial articulateness." Id. The
logic of the AEDPA is flatly inconsistent with such an approach.
 Mindful of these background principles, we turn to the
SJC's determination that the petitioner was not entitled to inquire
along the line that he proposed. As we already have observed,
cross-examination is subject to reasonable restrictions. One well-
established basis for circumscribing cross-examination is a party's
inability to lay a proper evidentiary foundation for the questions
that he wishes to pose. See, e.g., United States v. Ovalle-
Marquez, 36 F.3d 212, 218-19 (1st Cir. 1994); United States v.
Carty, 993 F.2d 1005, 1010 (1st Cir. 1993). The SJC relied upon
this principle to conclude that the petitioner's Confrontation
Clause claim lacked merit. See Bui I, 419 Mass. at 401, 645 N.E.2d
at 694-95 (holding that the petitioner's offer of proof was too
tenuous to justify the desired inquiry).
 This brings us to the offer of proof. It prophesied that
Thinh, if allowed to answer the proposed questions, would
acknowledge that the petitioner rebuffed Mong's entreaty to ferry
narcotics from California to Boston. Defense counsel purposed to
argue from this response that the repudiation so angered Mong that
he directed Thinh to frame the petitioner. But to that point in
the trial, there had been no evidence even remotely supporting the
petitioner's offer of proof. When the court inquired into the
predicate for the offer, counsel did not cite any evidence, but
replied instead that he had a good-faith basis founded on attorney-
client privilege. On this exiguous record, the mere invocation of
the petitioner as the source was not enough to negate the inherent
speculativeness of the offer, especially since the petitioner
neither testified at trial nor submitted an affidavit as part of
the proffer.
 Even were we to assume, as did the state trial court,
that petitioner had made a good-faith proffer, we still could not
conclude that the SJC's determination that the offer of proof was
unsatisfactory so offended existing Supreme Court precedent as to
be unreasonable. Apart from its foundational infirmities, the
petitioner's offer of proof was inherently defective because it did
not include crucial elements of his bias theory. He sought to ask
Thinh three questions: (1) Was Mong present in California while
Thinh and the petitioner were there? (2) Did Mong ever ask the
petitioner to transport drugs to Boston? (3) If so, did the
petitioner refuse? However, we agree with the SJC that the
petitioner's theory of bias had more components than could be
addressed by responsive answers to these three questions. See Bui
I, 419 Mass. at 401-02, 645 N.E.2d at 695. It ultimately depended
on demonstrating facts relating to matters such as the relationship
between Mong and the petitioner, the relationship between Mong and
Thinh, the presence (and identity) of others in the course of the
alleged repudiation, and the tenor of Mong's reaction. Neither the
proposed questions nor the petitioner's offer of proof touched upon
these issues. On this sparse record, both the trial court's
limitation on cross-examination and the SJC's affirmance on the
ground that the offer of proof was too tenuous were in conformity
with federal court precedents requiring a satisfactory evidentiary
foundation for cross-questioning, see, e.g., Ovalle-Marquez, 36
F.3d at 218-19; Carty, 993 F.2d at 1010, and thus neither decision
implicated the AEDPA standard.
 United States v. Lynn, 856 F.2d 430, much relied upon by
the petitioner, does not demand a different result. If anything,
the facts of Lynn highlight one of the main shortcomings of the
petitioner's offer of proof. Lynn exemplifies those cases in which
courts have disapproved restrictions on questioning about bias when
cross-examination seeks to probe whether a prosecution witness will
get preferential treatment from law enforcement in return for
testifying. In these instances, courts have been especially open
to permitting cross-examination about agreements between government
and witness. In the same vein, courts have recognized, albeit less
frequently, that similarly distorting influences may arise from
other innately coercive relationships. See, e.g., United States v.
Abel, 469 U.S. 45, 52 (1984) (discussing witness's membership in a
gang or secret group as productive of coercion).
 Whatever the source of the alleged coercion, however,
courts traditionally have required a solid showing that coercion is
present. See Carty, 993 F.2d at 1010. Where there is no evidence
of a coercive dimension in the relationship between a witness and
an organization, trial courts cast well within their discretion in
prohibiting cross-examiners from mounting fishing expeditions. SeeSinclair, 109 F.3d at 1537; United States v. Elkins, 70 F.3d 81,
83-84 (10th Cir. 1995); United States v. Warren, 18 F.3d 602, 603
(8th Cir. 1994); United States v. Piche, 981 F.2d 706, 715-16 (4th
Cir. 1992). Here, the singularly essential element of the
petitioner's theory a relationship of coercion between a person
purportedly interested in the outcome of the trial (Mong) and the
witness (Thinh) utterly lacked an evidentiary foundation. 
Indeed, the petitioner made no attempt to address this element in
his offer of proof or contemporaneously in some other fashion. 
Under these circumstances, we do not believe the petitioner can
rely on Lynn to undo the SJC's conclusions.
 In performing our Confrontation Clause analysis in this
case, we find the opinion in United States v. Lin, 101 F.3d 760
(D.C. Cir 1996), to be particularly instructive because that case
presented circumstances comparable to those that surround this
case. There, the defendant sought to assail the government's
witnesses by suggesting that they were testifying against him
because they worked for a competing gambling parlor and wanted him
out of the way. When Lin attempted to cross-examine one witness by
inquiring into his gambling activities, the government objected and
the district court requested a proffer. Defense counsel made an
offer of proof that limned his theory of bias and identified his
client as the source of the allegations. The trial court
eventually sustained the government's objection. The court of
appeals affirmed, upholding the trial court's decision not to allow
the initiation of "a highly prejudicial line of cross-examination,"
in circumstances in which the questioner did not show that he
possessed facts sufficient to "support a genuine belief that the
witness committed the offense or the degrading act to which the
questioning relates." Id. at 768 (citation and internal quotations
marks omitted). Like Bui, Lin elected not to testify, and the
court viewed his proffer as "too ambiguous" to indicate that the
proposed questioning had any realistic potential for showing bias.
 Many of the principles that animated Lin are pertinent to
the case at hand. First and foremost, Lin, like so many of the
precedents we have culled, holds that cross-examination presupposes
the existence of a proper foundation. Offers of proof that do not
carry the promise of demonstrating bias do not satisfy this
requirement; indeed, such offers may be considered irrelevant. See 
Carty, 998 F.2d at 1010. Furthermore, in Lin as in this case, the
trial court left open the possibility that witnesses could be
recalled and the line of inquiry reopened if the defense
subsequently made a better proffer. Like Lin, Bui never returned
with a beefed-up presentation. Finally, as Lin suggests, questions
that implicate a witness's involvement in elaborate conspiracies to
commit illegal acts have the potential to be prejudicial and
misleading. And when the potential for this kind of prejudice
exists, the need to insist that cross-examination be based on a
solid foundation is heightened.
 In an effort to deflect this logic, the petitioner seizes
upon the trial judge's comment that the questions his lawyer sought
to ask were irrelevant (and thus inadmissible). This assessment
was misguided, the petitioner says, because the general issue of
bias is always relevant. See Davis v. Alaska, 415 U.S. 308, 316
(1974). We are unimpressed by this wordplay. In context, we
interpret the trial judge's relevancy ruling to mean that, given
the scantiness of the record evidence and the incomplete offer of
proof, the petitioner's proposed questions were not sufficiently
probative of his particular theory of bias, and, therefore, not
relevant to that issue.
 Let us be perfectly clear. We do not mean to suggest
that a criminal defendant must testify in his own behalf, or
alternatively, that he must arm himself with irrefutable proof
before he may cross-examine witnesses about a particular bias. We
do believe, however, that a defendant in such circumstances must
present a satisfactory foundation for the critical elements on
which his hypothesis of bias depends. In this instance, the
petitioner, having been accorded a fair opportunity to inquire into
Thinh's bias, failed to meet that criterion. Hence, we cannot
fault the trial judge's decision to bar the petitioner from asking
Thinh all the specified questions. See Delaware v. Fensterer, 474
U.S. 15, 20 (1985) (stating that the "Confrontation Clause
guarantees an opportunity for effective cross-examination, not
cross-examination that is effective in whatever way, and to
whatever extent, the defense might wish"); Boylan, 898 F.2d at 254
(same).
 We add a coda. Even under the regime of Teague v. Lane,
489 U.S. 288 (1989), constitutional law was not to be considered
the "exclusive province" of inferior federal courts, Caspari v.
Bohlen, 510 U.S. 383, 395 (1994), and such courts, in the absence
of a contrary, established rule announced by the Supreme Court,
were obliged to "validate[] reasonable, good-faith interpretations
of existing precedents made by state courts even though they [were]
shown to be contrary to later decisions." Butler v. McKellar, 494
U.S. 407, 414 (1990). That approach has been underscored by the
AEDPA standard of review. See O'Brien, 145 F.3d at 25; see alsoHennon, 109 F.3d at 335 (stating that, under AEDPA, state courts
are no longer in a "tutelary relation" with federal courts). Thus,
absent a controlling Supreme Court precedent, mere disagreement
with a state court's legal analysis is not enough to permit a
federal court to vacate a state conviction; rather, it must be
shown that the state court's application of federal law was
unreasonable. This sets the bar quite high.
 There is, of course, some doubt as to the degree of
elevation necessary to separate reasonable and unreasonable
applications of federal law. Here, however, we need not pinpoint
that location precisely. The SJC's analysis regarding the
petitioner's Confrontation Clause claim clears the bar because it
comports with the approach taken by the courts of appeals in
numerous cases raising comparable scenarios. When, as now, a
petitioner can show only that rational minds might differ over how
to apply certain general constitutional principles to the specific
circumstances of his case, the current habeas corpus standard of
review does not allow a federal court to invalidate a state
conviction.
V. CONCLUSION
 We need go no further. The petitioner fails to convince
us that the SJC's holdings are contrary to, or an unreasonable
application of, Supreme Court precedent. Accordingly, the judgment
below must be

Affirmed.